772 F.2d 740
 TRUST COMPANY BANK as Trustee for Eugene Muse Mitchell and
Joseph Reynolds Mitchell under Trust Instruments dated
November 5, 1975, and Trust Company Bank, as executor of
deceased Stephens Mitchell, Plaintiff-Appellee,
v.
MGM/UA ENTERTAINMENT COMPANY, Defendant-Appellant.
 No. 84-8605.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 27, 1985.
 
 Robert L. Pennington, Atlanta, Ga., Michael Brourman, Howard I. Friedman, Los Angeles, Cal., for defendant-appellant.
 Gary W. Hatch, Atlanta, Ga., Melville B. Nimmer, Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before HILL and FAY, Circuit Judges, and HOFFMAN*, District Judge.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 Appellant/defendant MGM/UA Entertainment Company ("MGM") appeals a district court order, 593 F.Supp. 580, holding that appellees/plaintiffs, not MGM, possess the "sequel rights" to Gone with the Wind. We affirm.
 
 I. FACTS
 
 2
 In 1936, Margaret Mitchell, author of the classic novel Gone with the Wind, entered into a written agreement with Selznick International Pictures, Inc. ("SIP"), MGM's predecessor-in-interest. Under this 1936 agreement, Ms. Mitchell granted the motion picture rights to the novel to SIP. The agreement was silent as to whether Ms. Mitchell also granted SIP "sequel rights," which, in the motion picture industry, are defined as the right to use characters portrayed in original stories in new and different stories. E.g., Goodis v. United Artists Television, Inc., 425 F.2d 397, 406 (2d Cir.1970); Landon v. Twentieth Century-Fox Film Corp., 384 F.Supp. 450 (S.D.N.Y.1974). The parties apparently did not discuss the matter of sequel rights during their negotiations.
 
 
 3
 While there was no talk of sequel rights before the 1936 agreement was executed, there was much talk of them afterward. Beginning in February 1938, which was even before the movie was into production, David O. Selznick, president of SIP, made efforts to acquire sequel rights to Gone with the Wind from Margaret Mitchell. At that time, he sent a memorandum to Katharine Brown, SIP's east coast representative, stating in relevant part:
 
 
 4
 I wonder if you couldn't start the wheels going toward a GONE WITH THE WIND sequel with an agreement on our part to pay a substantial price.
 
 
 5
 Inevitably a sequel to this story will be very valuable, both from publication and picture standpoints, and while I feel it practically certain that if and when Miss Mitchell should write such a sequel she would offer it to us, I feel that perhaps we could stir her into writing one partially through making it clear how much money she could make out of such a sequel through what we would agree to pay, and what book publishers, magazines and newspaper syndicates would agree to pay, which I think might cause her to get busy on such a sequel.
 
 
 6
 ....
 
 
 7
 If all else failed, and as a considerably less desirable alternative, perhaps she would sell us the future exclusive radio, television and picture rights to the characters of Rhett and Scarlett, which would permit us to do our own sequel, or sequels, just as M.G.M. has done and are [sic ] doing with THE THIN MAN series.
 
 
 8
 Plaintiff's Exhibits at Tab 8, Document No. 4002. Ms. Brown responded that she would attempt to get the sequel rights from Ms. Mitchell, but advised that she would prefer to postpone any such conference until after production of Gone With the Wind began.
 
 
 9
 Production got started shortly thereafter, and the motion picture, starring Clark Gable, Vivian Leigh, Leslie Howard and Olivia DeHaviland, premiered in Atlanta on December 15, 1939. It was an immediate artistic, critical and commercial success, and continues today to be one of the most successful pictures ever made. Once the picture came out, the public clamored to know whether Rhett and Scarlett, the two protagonists of the movie, ever reunited.
 
 
 10
 Apparently encouraged by this public clamor, Mr. Selznick continued his efforts to acquire sequel rights. In January 1940, he sent a memorandum to Ms. Brown and Mr. J.H. Whitney, a major stockholder and officer of SIP, stating in relevant part:
 
 
 11
 I assure you we can make more money than we can out of making two or three 'REBECCA's' simply by selling the sequel rights together with Miss Leigh, if we are foolish enough not to make the pictures ourselves.
 
 
 12
 I think we ought to get busy on this, and without any more nonsense about what an awful thing it would be to do. TO WHOM, IS WHAT I WANT TO KNOW? The public wants it, the exhibitors want it, MGM wants it, and I want it, and what are you three (the two of you and Miss Mitchell) against so many? I think we should try to buy all sequel rights from her so that we can go on making sequels forever, in the manner of 'The Thin Man,' if that should prove, as I suspect it would, to be a more profitable endeavor than making all the other pictures we can think of combined.
 
 
 13
 Id. at Tab 13, Document No. 4014. In February, he again wrote to Ms. Brown:
 
 
 14
 There is only one thing I want to get out of the Marshes [i.e., Ms. Mitchell and her husband, John Marsh], and that is to buy sequel rights from them.... Whether or not we ourselves ever make the dequel [sic], there is a fortune to be made on a deal under which Metro would make the picture, if we didn't want to make it ourselves. And there is literally nothing in our projected future comparably important from a financial standpoint with the securing of these sequel rights.
 
 
 15
 Id. at Tab 14, Document No. 4015.
 
 
 16
 Ms. Mitchell was opposed to any effort to carry on the story of Rhett and Scarlett beyond the end of the novel, primarily because she believed any resolution of what happened to Scarlett and Rhett would undermine the integrity of the original story. In 1940, her husband, John Marsh, wrote a letter to Daniel O'Shea, assistant to the president of SIP, stating:
 
 
 17
 You may be certain that we will take steps to prevent any sale or use of this purported sequel, for Mrs. Marsh does not intend to have her sequel rights infringed upon in any way. Of course, the rights are worth a lot of money to her, but, beyond that, she feels a personal interest in Scarlett, Rhett, and the other characters she created and she would fight to defend them from misuse and abuse by some other writer.
 
 
 18
 Id. at Tab 15, Document No. 4035.
 
 
 19
 On June 6, 1940, Ms. Brown wrote Ms. Mitchell, informing her that Mr. Selznick "would like to purchase from you the sequel rights...." She continued,
 
 
 20
 He ... asked me to ask you two questions: 1., if you would write a sequel to 'GONE WITH THE WIND' in book form, or in narrative motion picture form (the latter would mean an outline with as much or as little dialogue as your prefer); 2., if you yourself would not care to write a sequel, would you sell to us the right to create a sequel ourselves.
 
 
 21
 Id. at Tab 16, Document No. 4042. In a letter dated June 14, 1940, Ms. Mitchell responded,
 
 
 22
 About the sequel rights, your inquiry was not unexpected, as there have been so many stories in the newspapers about proposed or possible sequels to the movie. I appreciate the frankness with which you discuss the situation and I will answer in the same manner, as follows:
 
 
 23
 1. I have no plans at this time for writing a sequel to 'Gone With the Wind'; 2. I would not consider selling the right to create a sequel, to Mr. Selznick or anybody else.
 
 
 24
 Id. at Tab 17, Document No. 4043.
 
 
 25
 Ms. Mitchell's letter did not end the matter. Mr. Selznick continued to write Ms. Brown about sequel rights and Ms. Brown and others continued to communicate with Ms. Mitchell about them throughout the 1940s. Ms. Mitchell continued to refuse and was adamant right up to her death in 1949 that no sequel ever be made.
 
 
 26
 When Margaret Mitchell died in 1949, all her rights in Gone with the Wind were transferred to her husband, John Marsh. When Mr. Marsh died in 1952, all rights in the novel passed to Ms. Mitchell's brother, Stephens Mitchell.
 
 
 27
 Ms. Mitchell's death had an effect on the status of the rights of SIP in Gone With the Wind. In the 1936 agreement, Ms. Mitchell had agreed to renew the copyright to Gone with the Wind prior to expiration of the original copyright in 1963 and that SIP would have rights in the novel during the renewal copyright period. However, under settled law, her estate was relieved of that contractual obligation because Ms. Mitchell died before the initial term of copyright in the novel expired. E.g., Miller Music Corp. v. Charles N. Daniels, Inc., 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960). To retain motion picture rights in Gone with the Wind after the original copyright expired in 1963, MGM, as successor-in-interest to SIP, had to obtain a grant of renewal rights from Stephens Mitchell, in whom such rights were vested in the early 1960s. MGM was, obviously, anxious to obtain this renewal, since Gone With the Wind was one of its most valuable properties, if not its most valuable property.
 
 
 28
 MGM and Stephens Mitchell, through their representatives, commenced negotiations for the grant of renewal rights in January 1961. Negotiations lasted thirty months, culminating in May 1963 with the execution of a written agreement dated December 4, 1961 ("the 1961 agreement"). The 1961 agreement provided that MGM was to receive "[a]ll the same rights under renewal copyright as were granted to SIP under the [1936 agreement]...." It further provided that "[a]ll rights not herein sold or agreed to be sold to Metro are reserved for use to Owner...." Like the 1936 agreement, the 1961 agreement was silent as to "sequel rights" in haec verba. However, it did include the following clause in p 7(a)(i)(2):
 
 
 29
 Metro shall have no right to produce any motion picture or other production with the plot or the story or the characters of the Novel, in which the lives of the characters therein shall be carried beyond the time of the ending of the Novel.
 
 
 30
 The matter of sequel rights was never discussed during the negotiations, except in regard to the above clause. Stephens Mitchell was determined to honor his sister's wishes that the story not be extended beyond the end of the novel, and insisted adamantly that MGM not have the right to make such a motion picture. MGM finally agreed to this demand, and p 7(a)(i)(2) was included.
 
 
 31
 No mention was made of sequel rights again until 1975 when Mr. Mitchell abandoned his long-standing refusal to permit a motion picture continuing the story beyond its end and told his agent, Katharine Brown, that he would be willing to consider offers for the rights to produce such pictures. In the summer of 1975, ICM (Ms. Brown's agency), representing Mr. Mitchell, initiated discussions with Universal Pictures regarding a possible sequel motion picture. MGM was made a party to these negotiations. Throughout early 1976, the three parties--the Mitchells, Universal and MGM--negotiated the salient deal points. In June 1976, the parties executed two agreements that collectively gave MGM and Universal the right to produce a sequel motion picture. Although an extension agreement was subsequently entered into extending, for an additional year, the time to produce such a sequel, the project, ultimately, was abandoned.
 
 
 32
 In 1981, appellees/plaintiffs filed this diversity suit against MGM in the United States District Court for the Northern District of Georgia.[1] They sought a determination of whether they or MGM own the sequel rights to Gone with the Wind. The district court concluded that neither the 1936 nor the 1961 agreement granted sequel rights to MGM.
 
 
 33
 The court granted summary judgment to appellees with respect to the 1936 agreement. The court determined that the agreement, which was silent on the matter of sequel rights, was ambiguous. After reviewing the extrinsic evidence submitted, the court concluded that no question of fact was raised and that the evidence clearly showed that the parties did not intend for the contract to convey sequel rights.
 
 
 34
 The court determined that interpretation of the 1961 agreement did raise questions of fact, and a bench trial was held. The evidence submitted to the court consisted mostly of deposition testimony and documentary exhibits, though there was some live testimony. The trial court decided that nothing in the language of the agreement indicated that sequel rights were conveyed and that the extrinsic evidence showed that the parties did not intend for sequel rights to be conveyed to MGM.
 
 II. DISCUSSION
 A. The 1936 Agreement
 
 35
 The district court's grant of summary judgment to appellees was proper if, viewing the evidence in the light most favorable to appellant, there is no genuine issue as to any material fact and appellees are entitled to judgment as a matter of law. E.g., Sweat v. Miller Brewing Co., 708 F.2d 655 (11th Cir.1983); 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2716 (1983). The district court's decision passes muster under this standard. The extrinsic evidence consisted primarily of the post-agreement correspondence between David O. Selznick, Katharine Brown and Margaret Mitchell, quoted from and referred to earlier in this opinion. These letters and memoranda indicate that following execution of the 1936 contract Mr. Selznick sought persistently to obtain sequel rights from Ms. Mitchell and she adamantly refused to grant them. The correspondence makes it clear that Ms. Mitchell did not intend to convey sequel rights to SIP in the 1936 agreement and that Mr. Selznick, President of SIP, did not believe SIP had acquired such rights in the 1936 agreement.
 
 
 36
 To establish a genuine issue of fact, appellant points to: (1) certain provisions in the 1936 agreement; (2) a letter by John Marsh analyzing the terms of the 1936 agreement; (3) Ms. Mitchell's acknowledgement that MGM could "produce Uncle Tom's Cabin and call it Gone with the Wind "; and (4) deposition testimony of Stephens Mitchell. None of this evidence suggests that the parties intended the 1936 agreement to convey sequel rights, thus creating an issue of fact. The contract provisions relied on by appellant are ambiguous regarding sequel rights and are the very provisions it is hoped extrinsic evidence will clarify. They cannot create a question of fact as to the parties' intentions regarding sequel rights. Mr. Marsh's letter makes no mention of sequel rights. Viewing it in the light most favorable to appellant, it, at most, reflects an understanding that extensive rights in Gone with the Wind were granted to SIP, including the right to make changes in that story. But this does not reflect an understanding that the contract granted the right to use characters from Gone with the Wind in new and entirely different stories. Ms. Mitchell acknowledges only that the title could be used in an entirely different story. She says nothing about the transfer of the characters. Nor does such a suggestion follow from her acknowledgement. Finally, none of the statements in Mr. Stephens Mitchell's deposition testimony, relied on by appellant, indicate that Margaret Mitchell believed she had granted, or intended to grant, sequel rights. Nor do we find them to indicate that Stephens Mitchell, who apparently participated in the negotiations for the 1936 contract, believed such rights had been granted.[2]B. The 1961 Agreement
 
 
 37
 The trial court stated three reasons for concluding that the 1961 agreement did not convey sequel rights. First, the 1961 agreement expressly granted to MGM "[a]ll the same rights under renewal copyright as were granted to SIP under the [1936 agreement]," and no sequel rights were granted under the 1936 agreement. Second, under Warner Brothers Pictures, Inc. v. Columbia Broadcasting System, Inc., 216 F.2d 945 (9th Cir.1954) ("the Sam Spade case"), the general grant of motion picture rights does not, as a matter of law, include an implicit grant of sequel rights; and (3) extrinsic evidence indicated the parties did not intend to convey sequel rights in the agreement.
 
 
 38
 Appellant argues that the first two reasons are erroneous because neither the language in the "granting clause" nor the failure explicitly to grant sequel rights is determinative. According to appellant, the court had to look to extrinsic evidence to determine the intent of the parties.
 
 
 39
 We find no need to comment on appellant's claims of error regarding the first two reasons offered by the trial court. There is no indication in the record that the district court considered either reason dispositive, and the fact is that the court did examine the extrinsic evidence,[3] finding that it showed that the parties did not intend to convey sequel rights. Thus, the crux of appellant's claim is that the trial court erred in finding that the extrinsic evidence showed the parties did not intend to transfer sequel rights. We begin our examination of that claim by outlining in greater detail the district court's findings.
 
 
 40
 MGM had argued to the district court that the extrinsic evidence, when viewed in conjunction with the language of the 1961 agreement, showed that the parties intended that sequel rights be granted to MGM, subject to the restriction in p 7(a)(i)(2) that there be no sequel carrying on the story or the characters in the story beyond the end of the novel. According to appellant, the granting clause, which stated that MGM receive "[a]ll the same rights under renewal copyright as were granted to SIP under the [1936 agreement]," conveys sequel rights to MGM. Then, p 7(a)(i)(2) restricts the exercise of those rights, so that all sequels can be made except one that would carry the story or lives of the characters beyond the end of the novel. Thus, for example, MGM could make a movie entitled "Tara The Early Years" or one based on Ashley Wilke's Civil War exploits. However, it could not make a movie about Scarlett and Rhett's subsequent reconciliation. MGM had been given the right to make any and all sequels, but a restriction had been placed on the exercise of that right with respect to this one type of sequel.
 
 
 41
 The district court rejected MGM's interpretation of the extrinsic evidence. The court reasoned that Stephens Mitchell had the stronger bargaining position in the negotiations since MGM had to enter into a contract with Stephens Mitchell or lose its rights to Gone With the Wind, which was its most valuable property. Further, the court concluded that Mr. Stephens Mitchell, who had the upper hand, was firm throughout the negotiations that no sequel rights be conveyed. The court also reasoned that MGM was fully aware of the Sam Spade decision, which had indicated that one could not necessarily rely on an implicit grant of sequel rights in an agreement conveying motion picture rights. The court also determined that MGM negotiators were not sure whether MGM had obtained sequel rights under the 1936 agreement and reasoned that the best strategy to take during the 1961 negotiations was to leave the question of sequels alone and proceed to get the right to continue showing Gone With the Wind.[4] The court also stated that it was unwilling to hold that a clause expressly prohibiting sequels in which the lives of the characters are carried beyond the time of the ending of the novel amounted to a grant of sequel rights for other time periods.
 
 
 42
 The standard of review to be applied to the district court's factual findings is the "clearly erroneous" standard, even though the extrinsic evidence involved consisted primarily of deposition and documentary exhibits. While there had been some doubt as to the standard of review to be applied to factual findings that rest on such documentary evidence rather than on credibility determinations, the Supreme Court has recently held that the mandate of Fed.R.Civ.P. 52(a) that district court factual findings not be set aside unless "clearly erroneous" applies to findings based on physical or documentary evidence as well as to those based on witness credibility determinations. Anderson v. City of Bessemer City, North Carolina, --- U.S. ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).
 
 
 43
 A finding is "clearly erroneous" when it is not supported by the record or "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The trial court's findings and reasoning pass muster under this standard. To show that the court's findings are amply supported by the record, it is necessary to make a distinction between what, according to the record, the parties to the agreement meant by "sequel rights" and what MGM in the instant case claims the term "sequel rights" means. MGM introduced evidence to show, and takes the position that, in the motion picture industry "sequel rights" are understood to mean a work that follows another, regardless of whether the successive work is set prior to, during, or after the time period of the first work. While this may well be so, the record shows that in all the communications between the parties involved in this case--be it Margaret Mitchell and David Selznick or Stephens Mitchell and MGM--"sequel" was never used to mean anything other than its common sense, dictionary meaning; namely, a literary work continuing the course of a narrative begun in a preceding one. No other meaning of "sequel" was ever raised by the parties until this litigation (or, perhaps, the 19 75/76 negotiations between Mr. Mitchell, MGM, and Universal for sequel rights). Until then, when the parties spoke of sequels, they meant continuations.
 
 
 44
 The record shows that, during the negotiations for the 1961 contract, non-continuation sequels were never mentioned. It seems from the record that no one--neither MGM nor Stephens Mitchell--had ever considered making a non-continuation sequel. This is not surprising, since there would be no reason for MGM at the time to have an interest in making a movie about Tara's early years or Ashley Wilke's Civil War exploits. The public clamor and interest had always been in a continuation of the story of Rhett and Scarlett, revealing whether the two had reconciled. Given this evidence (or lack of it), the district court certainly was not required to find that the parties intended that non-continuation sequel rights be granted to MGM.
 
 
 45
 While there was no discussion of non-continuation sequels, there was discussion about continuations. In this regard, the evidence, particularly documentary evidence, shows that Stephens Mitchell did not believe the 1936 agreement granted sequel rights to SIP[5] and that up until 1975 Stephens Mitchell had always taken the position that sequel rights (i.e. continuations) must be retained by him. Contemporaneous documents, prepared both in the period prior to negotiations for the 1961 agreement and during those negotiations, indicate Stephens Mitchell was adamant in respecting his sister's wishes that there be no "sequel" (i.e. continuation), and refused to grant "sequel" rights to MGM or anyone else. Memoranda, prepared by MGM during the course of the 1961 negotiations, report that Stephens Mitchell was firm that MGM was not to obtain sequel rights under the 1961 agreement.
 
 
 46
 Given this evidence, the district court was not required to find that the parties intended that the granting clause in the 1961 agreement give MGM the right to make a continuation and that p 7(a)(i)(2) merely restrict MGM from exercising that right. A finding that p 7(a)(i)(2) expressly excluded continuation rights from the rights granted MGM is amply supported by the record. This is especially so, since, as the trial court found, Stephens Mitchell, not MGM, had the superior bargaining position. At the time of these negotiations, MGM had a large investment in its film Gone With the Wind and, due to the film's success and popularity, stood to make substantial profits from further exhibitions of it. Because of Ms. Mitchell's death and copyright law, MGM stood to lose the right to show the film ever again. Not only was Mr. Mitchell in the position to prevent MGM from deriving further profit from the existing movie, he also was in the position to sell to another the right to produce the movie. Given this situation, it obviously would not have been in MGM's best interest to jeopardize the negotiations by adding a request that Mitchell actually grant MGM continuation rights, which was well known to provoke negative reactions from the Mitchells. It is therefore not surprising that the record indicates that MGM never suggested that it was bargaining for continuation rights. Nor did MGM request that any language be added to the granting clause or elsewhere to make it clear that the right to make a continuation was granted to MGM but that MGM simply could not exercise that right. The record indicates that MGM did not request such clarity because it knew Stephens Mitchell would not agree to it. From MGM's point of view, it was better to let sleeping dogs lie.
 
 
 47
 Further, given the history between the Mitchells and SIP and MGM regarding sequel rights--particularly, Mr. Selznick's attempt to obtain them from Margaret Mitchell--the district court was not required to adopt MGM's position that "there would have been no purpose [to include p 7(a)(i)(2) and] limit[ ] MGM's ability to exercise sequel rights unless those rights had in fact otherwise been granted by the instrument." Perhaps, this is best demonstrated by considering appellant's argument in the context of a simple property situation:
 
 
 48
 If one leases tract A from the owner for a term of years; and
 
 
 49
 if, thereafter, the lessee persistently seeks to lease, from the same owner, tract B, across which he wishes to construct a road for ingress and egress, but is refused; and
 
 
 50
 if toward the end of the term the lessee negotiates for and obtains a renewal of the lease of tract A;the fact that, in the renewal, the owner specifically provides that the renewal does not permit the lessee to construct a road across tract B does not in and of itself mean that the parties intended to convey a leasehold interest in tract B.
 
 
 51
 In its effort to show that, despite all the above cited evidence and reasonable inferences drawn therefrom, the district court's decision is clearly erroneous, appellant relies almost exclusively on the post-agreement conduct of the parties and the trial and deposition testimony of Mr. Stephens Mitchell and the lawyers involved in negotiating the 1961 contract.[6] For the most part, appellant's arguments in this regard clearly lack merit. In regard to the post-agreement conduct of the parties, appellant notes that, in 1975, when Stephens Mitchell entered into negotiations with Universal Studio regarding the grant of motion picture sequel rights in Gone with the Wind to Universal, MGM was included in the negotiations. MGM also points out that two separate sequel rights agreements were signed: one between Universal and Mitchell; and one between Universal and MGM. Appellant argues that this shows that Stephens Mitchell, his representatives, and Universal acknowledged MGM's sequel rights. However, the evidence indicated that the parties involved, including Universal, were aware that MGM claimed it had sequel rights. As the district court noted, the evidence indicated that "[i]nviting MGM to participate in the negotiations was simply a way to avoid a lawsuit, not an acknowledgment that MGM did, in fact, have sequel rights." Record, vol. 6, at 1544.
 
 
 52
 Appellant also points to the testimony of Mr. Stephens Mitchell and the lawyers involved in the negotiations. It is not at all clear to us that the testimony of Mr. Stephens Mitchell or attorney Paul Sherman, who represented the Mitchell interests in the negotiations for the 1961 agreement, supports appellant's interpretation of the 1961 agreement. Mr. Mitchell's testimony seems perfectly consistent with the documentary evidence, which, as noted earlier, indicates that Mitchell did not intend to convey sequel rights. We also note that the eighty-six year old Mr. Mitchell often stated that he could not recall many of the events, conversations and understandings involved in the negotiations, and that contemporaneous writings prepared at the time would be more reliable indicators of the understandings and events involved. It is true that Mr. Sherman testified that the 1961 Agreement granted sequel rights to MGM, subject to the restriction that the lives of the characters cannot be carried beyond the end of the novel. However, Mr. Sherman qualified such responses by stating that this was his understanding "now" of the language of the 1961 Agreement. He never stated that this was his understanding at the time the contract was entered into. Mr. Sherman noted repeatedly that he could not recall many of the events, conversations, and understandings involved in the negotiations of the agreement. Most notably, he stated he did not recall negotiations involving sequel rights or p 7(a)(i)(2).
 
 
 53
 Perhaps most favorable to appellant's position is the testimony of Mr. Melnicker and Mr. Robinson, who represented MGM in the negotiations. They testified that they believed the 1961 agreement granted all sequel rights to MGM, subject to the restriction in p 7(a)(i)(2). However, the court was not required to credit this testimony of interested parties. As noted above, there was a substantial amount of evidence, particularly documentary evidence, that contradicted any such testimony. Also, the testimony was based on the witnesses' recollection of events occurring twenty years earlier.
 
 
 54
 While we find most of appellant's arguments clearly to lack merit, there is one that does raise a particularly troublesome point. This argument focuses on the district court's attributing certain statements to Mr. Melnicker. In its opinion, the district court, after stating a number of reasons in support of its decision in appellees' favor, stated that
 
 
 55
 [another] matter militating against MGM's position is the testimony of Benjamin Melniker, who in 1961 was a member of the legal department of MGM and who participated in the negotiations leading to the 1961 agreement on behalf of MGM. Mr. Melnicker testified that MGM was not sure about its legal position with respect to whether it had previously obtained sequel rights to Gone With the Wind.... He further testified that it could have been in his mind that the best thing to do was simply leave the question of sequels alone and proceed to get the right to continue showing Gone With the Wind.
 
 
 56
 Record, vol. 6, at 1542. Appellant argues that Mr. Melnicker never made these statements in his testimony. We agree. Even though appellant made this argument in its brief and at oral argument, appellees have never pointed to a place in the record where Mr. Melnicker made these statements. Upon our own investigation of the record, we have not been able to find such statements in Mr. Melnicker's testimony.
 
 
 57
 Though this error gives us pause, it does not constitute reversible error. The error does not involve a finding of fact. The district court's finding of fact here is not that Mr. Melniker made these statements in his testimony. Rather, its finding of fact appears to be that, at the time of the negotiations, Mr. Melniker was unsure of the status of sequel rights and chose to avoid facing the sequel rights issue in the course of the negotiations. The record might not demand such a finding, particularly in light of the testimony of Mr. Melnicker and Mr. Robinson that they believed the 1961 agreement granted sequel rights to MGM, subject to the restriction in p 7(a)(i)(2). However, as noted above, the court was not required to accept these statements made by interested parties on the basis of their recollections of events occurring twenty years earlier, especially since there was no contemporaneous document clearly reflecting the alleged change in Mr. Mitchell's position regarding sequel rights. Further, other evidence, particularly the contemporaneous documents, do support a finding that Mr. Melnicker was not sure about the status of sequel rights, and that, like Scarlett O'Hara, Mr. Melnicker was willing to "worry about that [i.e., sequel rights] tomorrow." As noted earlier, the record certainly supports the conclusion that MGM would be reluctant to jeopardize the deal by raising a matter that was likely to create a negative reaction in Mr. Mitchell. The matter of the ownership of sequel rights was just such a matter. For these reasons, the district court's finding, while perhaps not demanded, is not clearly erroneous.
 
 
 58
 In essence, the court's erroneous attribution of these statements to Mr. Melnicker amounts to nothing more than an incorrect statement of the source of evidence. We will not set aside a decision adequately supported by the record merely because the source of the evidence is stated incorrectly.
 
 
 59
 All of appellant's arguments and the testimony relied upon indicate, at most, that the district court could have found that Mr. Mitchell granted sequel rights to MGM in the 1961 agreement.[7] However, that the district court could have found other than it did does not make its finding clearly erroneous. See United States v. National Association of Real Estate Boards, 339 U.S. 485, 495-96, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950); Bianchini v. Humble Pipe Line Co., 480 F.2d 251, 253 (5th Cir.1973). Particularly in light of all the contemporaneous documentary evidence indicating that Mr. Mitchell did not intend to grant sequel rights to MGM, we are not left with "the definite and firm conviction that a mistake has been committed" in this case.
 
 III. CONCLUSION
 
 60
 For the foregoing reasons, the order of the district court is
 
 AFFIRMED.[8]
 
 
 *
 Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Actually, the suit was originally instituted by Stephens Mitchell and Trust Company Bank in its capacity as trustee for Stephens Mitchell's sons, to whom Mitchell had transferred, in 1975, a substantial portion of his interest in Gone with the Wind. Stephens Mitchell died prior to trial. Trust Company Bank continued the suit on Mitchell's behalf in its capacity as executor of Stephens Mitchell's estate
 
 
 [2]
 Appellant relies, for example, on the following portion of Mr. Mitchell's deposition:
 Q. Paragraph 2f [of the 1936 Agreement] says: 'The owner will not cause or allow or sanction any dramatization of the property or any part thereof.'
 Mr. Mitchell, did you have any understanding as to the meaning of the phrase 'or any part thereof' that I've just read to you?
 A. Is that the whole clause?
 Q. No. I read the whole clause to you before.
 A. No, before having done so--what you asked me, did I have any right to do anything about any of those characters?
 Q. That was an earlier question.
 A. Oh, yes.
 Q. Did you have any understanding, however, of the meaning of the phrase 'or any part thereof,' as that phrase is contained in paragraph 2f?
 A. I though it meant taking particular instances out of the picture or out of the novel.
 Q. Or taking any constituent part of the novel?
 A. That's right, any part taken by itself.
 Q. That could be an incident. It could be a story line, or it could be characters, I take it, is that right?
 A. It could be the historical background.
 Q. Any of those things?
 A. That's right.
 Q. That was your understanding at the time of the '36 contract and thereafter, is that correct?
 A. So far as I remember it is. The correspondence, of course, will show what I thought. It is very hard to go back to what I was thinking of when I wrote that.
 Mitchell Deposition, Vol. 12, at 48-9. Based on this testimony, appellant maintains that Mr. Mitchell
 understood that when the [1936] agreement referred to 'the Property or any part thereof,' the phrase 'any part thereof' meant that SIP had the right to make a motion picture or motion pictures based upon any individual constituent part of the novel, such as an incident, a story line, the characters or the historical background.
 Opening Brief of Appellant at 60 (emphasis in original). We do not find it to be error for the trial court not to have interpreted Mr. Mitchell's testimony as the appellant now does, particularly since correspondence and other writings prepared at the time do not indicate that the Mitchells believed sequel rights were granted in the 1936 contract.
 
 
 [3]
 Appellant concedes as much in both its brief and oral argument. In its brief, MGM's counsel states, "the trial court found that the extrinsic evidence relating to the negotiation of the 1961 Agreement established that no conveyance of sequel rights was in fact intended by the parties." Brief of Appellant at 20. At oral argument, counsel for MGM stated that an "independent" ground of the trial court for finding for appellees was based on the extrinsic evidence
 
 
 [4]
 For further discussion regarding this factual finding, see pages 748 - 749 of the text
 
 
 [5]
 For example, the record reveals that Mr. Mitchell included the following statements in a letter to Mr. R.E. Samuels, an attorney for SIP, regarding an unauthorized sequel to Gone With the Wind published in Screen Guild Magazine:
 For example, in this fresh trouble, we are in agreement on the fundamental question, the ownership of the sequelization rights. There is no dispute about this. On several occasions, the Selznick Company has directly acknowledged and recognized that these rights belong exclusively to Mrs. Marsh. This was done most recently on June 6th, 1940, when Mr. Selznick transmitted to Mrs. Marsh through Miss Katharine Brown an offer to buy the sequel rights, which Mrs. Marsh refused. The company has never even asserted a claim to ownership of these rights.
 Plaintiff's Trial Exhibits at Tab 38, Document No. 25012.
 
 
 [6]
 Appellant also points to paragraph nine of the 1961 Agreement, noting that there the parties had enumerated the rights that had been reserved by the Mitchell interests, and that no mention is made therein of sequel rights. However, a reading of the beginning sentences of paragraph nine reveals this argument to be meritless: "All rights not herein sold or agreed to be sold to Metro are reserved for use to Owner, as their representative interests appear. Said reserved rights include, but are not limited to,...." (emphasis added). MGM's argument ignores the "but are not limited to" language of the provision. We do not find Landon v. Twentieth Century-Fox Film Corp., 384 F.Supp. 450 (S.D.N.Y.1974), cited by appellant, to make appellant's argument here persuasive
 
 
 [7]
 This is not to say that the evidence of intent was so convincing on both sides, or, alternatively, so meager, as to require application of the general construction rule that in doubtful cases a clause such as p 7(a)(i)(2) should be construed as a restriction of a grant rather than a reservation in order to maximize the grant to the grantee. See, e.g., Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 (2d Cir.), cert. denied, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); 26 C.J.S. Deeds Sec. 140(2) (1956). While it may not have been "clearly erroneous" for the court to have decided the case the other way, this was not a case where the intent of the parties could not be ascertained. A substantial amount of evidence supported the court's decision regarding the parties' intentions
 
 
 [8]
 We note that appellant maintains that, by stating in its judgment that the appellees owned "all" sequel rights in Gone with the Wind, the district court held that appellees not only owned motion picture sequel rights but television sequel rights as well. According to appellant, the conclusion regarding television rights is not supported by the record. Appellees claimed ownership of television sequel rights throughout the proceedings. The record fully supports the district court's conclusion that no sequel rights--motion picture or television--were conveyed to appellant, and that all such rights are possessed by appellees