**Paul ORAVEC, Plaintiff,**

v.

**SUNNY ISLES LUXURY VENTURES L.C., et al., Defendants.**

**No. 04–22780–CIV.**

United States District Court, S.D. Florida.

July 24, 2006.

Michelle A.H. Francis, Kirkland & Ellis, Chicago, IL, Russell E. Levine, Maria A. Meginnes, James N. Nowacki, Reed Oslan, Barry L. Haley, Malin Haley & Dimaggio, Fort Lauderdale, FL, for Plaintiff.

Robert John Borrello, Russomano & Borello, Miami, FL, Herman Joseph Russomanno, Susan Elizabeth Mortensen, Burlington Weil Schwiep Kaplan & Blonsky Penthouse A, Miami, FL, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SEITZ, District Judge.

THIS MATTER is before the Court on the parties' motions for summary judgment [DE–164, 167 and 170] which raise a myriad of issues.[1] Plaintiff Paul Oravec ("Oravec") alleges that Defendants violated the Copyright Act, 17 U.S.C. § 101, et seq., when they designed, developed and constructed twin high-rise condominiums in Sunny Isles Beach, Florida, based on his copyrighted architectural designs. In particular, Oravec has sued the architects of record, their firm, and several developers of the Trump Palace and Trump Royale ("Trump Buildings") on a theory of direct copyright infringement.[2] Oravec also sued a host of developer entities on theories of vicarious and contributory infringement.[3] After hearing the parties' arguments and carefully reviewing their papers, the applicable law and the voluminous record, the evidence viewed in a light most favorable to Oravec establishes that the architects are entitled to judgment as a matter of law on the direct infringement theory. Because there is no direct infringement liability in the case, the remaining derivative theories of liability against the other Defendants fail as a matter of law.

### I. INTRODUCTION

This case involves five separate copyrighted architectural designs owned by Oravec. The copyrights are dated 1996, 1997, 2002, March 2004 and April 2004. Summary judgment must be granted in Defendants' favor because, for one or more

1. The parties cross-moved for summary judgment on the validity of Plaintiff's copyrights and Defendants' affirmative defenses. Defendants also moved for summary judgment on the issues of direct infringement and the causal connection between the alleged infringement and the damages claimed. In addition, certain developer Defendants moved for summary judgment on the derivative claims against them. Although the dispositive issue is that there is no direct infringement, many of these other issues have been addressed.

2. Count One is a claim for direct infringement against the Sieger Suarez Architectural Partnership, Inc., its two principals Charles Sieger and Jose Suarez (collectively "Sieger Suarez"), and real estate developers Sunny Isles Luxury Ventures L.C. ("Sunny Isles") and Dezer Properties LLC ("Dezer Properties").

3. Count Two is a claim for vicarious copyright infringement against Michael and Gil Dezer, Dezer Development LLC ("Dezer Development"), Residences at Ocean Grande Inc. ("Residences"), Royale Florida Enterprises, Inc. ("Royale Florida"), and the Donald Trump Corporation and Donald J. Trump ("Trump Defendants"). Count Three, for contributory copyright infringement, is against the Trump Defendants.

reasons, each of the five copyrights, even when viewed in a light most favorable to Oravec, does not support a claim for direct copyright infringement. First, none of the Defendants could have copied the 2002 and April 2004 designs because the only alleged copying took place sometime between 1996 and 1998, and in no event could it have taken place after the challenged designs were substantially complete in 2000. Oravec admitted that the 2002 and April 2004 materials were created *after* the designs for the Trump Buildings were completed. Additionally, Oravec abandoned any copyright protection in the 2002 design when he submitted it to the World Trade Center competition.

As for the March 2004 copyright, it fails as a matter of law because it does not protect Oravec's materials as "architectural works," but only as "pictoral, graphic or sculptural work." As such, the law is clear that the March 2004 copyright does not protect against the construction of the Trump Buildings, even if they were copied from his designs. Rather, the March 2004 copyright only protects that material as graphic designs (i.e., photos, models and similar graphic work) and prevents others from copying his work to create similar pictures or models without his consent. There is no evidence in the record that Defendants' pictures or models, used in their advertising for example, are based on copies of Oravec's March 2004 copyrighted designs.

Finally, although Oravec owns valid copyrights for his 1996 and 1997 designs, and there is a genuine issue of material fact regarding whether the architects had access to these designs, there is insuffi-

cient evidence of substantial similarity to send the case to a jury. Considering the evidence in the light most favorable to Oravec, no reasonable jury properly instructed could find substantial similarity between the competing designs.

## II. FACTUAL BACKGROUND [4]

### A. Oravec and the Copyrighted Designs

Oravec is an architect from Czechoslovakia. He received his undergraduate degree from the Technical University in Bratislava in 1974. *See* Deposition of Paul Oravec ("Oravec Dep.") (Def.Ex. No. 16), p. 15. He received a masters degree in architecture from the Technical University in 1976 and was licensed as an architect in Slovakia in 1978. *Id.* at p. 16. Plaintiff worked in the design field in Europe for about four years until he came to the United States in 1983. *Id.* at p. 17. Plaintiff has never been licensed to practice architecture in the United States. *Id.* at p. 24.

After his arrival in the United States, Oravec worked for two architectural firms in New York City for approximately one year. *See* Oravec Dep. p. 20–21. His work consisted mostly of interior commercial design with some exterior reconstructions. *Id.* at p. 20–30. After that, he and his family moved to South Florida where he began working for Creative Displays, a company that designs and builds custom exhibits, trade shows and interiors. *Id.* at pp. 7–9, 20, 32. In 1995, while Oravec was working for Creative Displays designing an exhibit, he came up with the idea of

---

**4.** Defendants' various motions to strike Oravec's factual statements for failure to comply with the Local Rules are DENIED. *See* DE–228, 229, 231. Without addressing the specifies of the arguments, the Court notes that it has an independent duty to review the accura-

cy of the record and will not accept improperly supported or controverted statements as true. *See United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave. Miami, Fla.,* 363 F.3d 1099, 1103 n. 6 (11th Cir. 2004).

using convex, concave vertically stacked elements, which he later developed into a design concept for a high-rise building. *See* Oravec Dep., p. 145.

### (1) 1996 Copyright

Beginning in 1996, Oravec started registering his building designs with the United States Copyright Office ("Copyright Office"). In all, Oravec holds five certificates of copyright registration. *See* Plf. Ex. 9–10, 12–14. On July 1, 1996, the Copyright Office issued a certificate to Oravec for material titled "Reverse Horse Shoe Building" and described as "architectural drawings and model." *See* Plf. Ex. 9 (Copyright VAu 356–079). The certificate covers one multi-view drawing of a single high-rise structure composed of five stacked, alternating convex/concave "banana shaped" segments, or tiers, surrounding three free-standing cylindrical towers. The space between the tiers, in which the towers are located, is "hollow," something like the hole in an oval shaped doughnut when viewed from above. The five segments, or tiers, decease in height from the top to the bottom of the building and create a "peek-a-boo" view of the cylindrical towers when viewed from the front or back. The certificate also covers a related model. The main difference between the model and the drawing is that the model contains only two central towers rather than three. Both the model and the drawing plainly suggest the form of a building, but there are no detailed features included (i.e., balconies, windows, doors etc.). The completion date for these materials is listed on the certificate as 1996. Excerpts from the 1996 design are attached to this Order as Exhibits A1 and A2.

### (2) 1997 Copyright

The next year, on May 2, 1997, Plaintiff registered additional architectural work with the Copyright Office titled "Reverse Horseshoe Building—Twin Towers" as material derivative of his 1996 copyright. The 1997 copyright incorporates a twin tower design, includes photographs and more detailed drawings than the 1996 copyright. *See* Plf. Ex. 10 (Copyright VAu 389–810). The certificate covers six drawings and three photos of models. The drawings also depict a high-rise structure composed of five stacked, alternating convex/concave banana shaped segments surrounding three cylindrical towers. The three towers stand in the same type of oval shaped doughnut hole described in the 1996 design and the alternating convex/concave tiers create a "peek-a-boo" view of all three of the towers. Floor plans are included which show that the three towers house elevators and stairs. Except where the towers connect to the building to give elevator access, the towers are free standing with flat tops that extend above the roof line. The three towers stand in a straight line with the central tower appearing slightly wider in diameter than the other two.

The individual floor plans depict a lower parking level with ramps, and higher floors with various residences ranging from studio apartments to four-bedroom units. The photos depict a model, or pair of models, set in a mixed-use background. The models include detailed features such as landscaped terraces, an S-shaped base connecting the twin towers, the suggestion of windows and a circular centralized fountain between the two towers. The completion date for these materials is listed on the certificate as 1996. Excerpts from the 1997 design are attached to this Order as Exhibits B1, B2 and B3.

### (3) 2002 Copyright

In 2002, Oravec developed an architectural design for submission to the World

Trade Center Competition. Oravec Dep. 392–95. As part of the submission to the Lower Manhattan Development Corporation ("LMDC"), Oravec signed a letter "signifying [his] agreement that [he] reserve[d] no patent, trademark, copyright, trade secret or other intellectual property rights in any of the material that forms or is contained in [his] proposal." *See* Oravec Dep., p. 394.[5] Oravec claims that he believed the letter authorized the LMDC to publish his works. Oravec Dep., p. 142, 393–94. By signing the letter, Oravec believed that he was not abandoning any copyright protections. *See* Plf. Ex. 11 (Oravec Declaration, dated May 2, 2006), ¶ 2.

Later that year, on November 21, 2002, Oravec received a copyright certificate for architectural work titled "New World Trade Center Towers." *See* Plf. Ex. 12 (Copyright VAu 571–627). These are the same materials he submitted to the LMDC. *See* Oravec Decl. (Plf.Ex. 11), ¶ 2. The certificate covers seven photographs of a model very similar to the one in the 1997 certificate. The model possesses the same overall structure as the earlier models, having five alternating convex/concave segments surrounding three free standing cylindrical towers. The 2002 model incorporates what appears to be structural supports with a "swiss-cheese" design, and also extends the larger central tower above the outer two towers. The 2002 submission includes three computer generated city-scape layouts which show the building design in relation to other buildings within New York City. Some of the other models are also shown within the city setting. Finally, the 2002 certificate includes an overhead layout of the twin-tower design within the site of what appears to be the former World Trade Center. This layout shows the orientation of the two buildings and includes a centralized sunken plaza and sculpture with twin escalator/ramp features. The certificate of copyright registration states that the materials were created in 2002. *Id.* At his deposition, Oravec conceded that this 2002 design could not have been copied by Defendants because their design was already completed. Oravec Dep., p. 487.

**(4) March 2004 Copyright**

On March 4, 2004, Oravec received another certificate of registration for material described as "Convex–Concave Building Design." *See* Plf. Ex. 13 (Copyright VAu 633–833). The certificate indicates that the materials submitted were previously titled "Reverse Horseshoe Building, New World Trade Center" and were completed in the year 2001. *Id.* In his deposition, Oravec claimed that some of these materials were created much earlier, with the last one finished in 1999 or 2000. *See* Oravec Dep. 435. Whereas the materials submitted in the prior three copyright applications were identified as architectural work, these 2004 materials were identified as 3–dimensional sculpture, 2–dimensional artwork, and photographs. *See* Plf. Ex. 13. The March 2004 registration materials were identified as derivative of the previous three copyrights dated 1996, 1997, and 2002. *Id.* The March 2004 certification states that "[t]his material includes all previous designs and versions and depict[s] them in 3–D models/Photographs, Renderings/43 Pages." *Id.*

**(5) April 2004 Copyright**

Finally, on April 16, 2004, Oravec received a copyright certificate of registra-

---

**5.** The actual letter signed by Oravec is not in the record, although an unsigned copy of the letter is. Def. Ex. 39. Oravec conceded at his deposition that he signed and returned such a statement. Oravec Dep., p. 394.

tion for a "Tripod Version" of a "Convex/Concave Highrise Building Design." *See* Plf. Ex. 14 (Copyright VAu 621–049). As with the earlier designs, there are five alternating segments. However, rather than using alternating convex/concave shapes which are oriented to face one another, this design offsets the convex/concave shapes at an angle to each other to create a triangle or tripod shape when viewed from above. Also, rather than having three free standing centralized towers in the void at the center of the structure, this design employs one central tower and three outer towers. The alternating convex/concave segments connect two of the outer towers and run through the center core.

The April 2004 certificate covers eight computer generated images of this design in isolation and one with the building situated in the New York City skyline. There is also a drawing showing the orientation of the various segments and a rough floor plan drawing of the interior of one of the segments. There are no interior details to the floor plan except that the towers are shown to contain stairs and elevators. These materials were listed as derivative of the 1996, 1997, and 2002 registered materials and described as illustrating a new adaptation to the previous designs by adding three rotated segments instead of two. The certificate of registration gives 2004 as their completion date. Oravec admitted at his deposition that Defendants could not have copied these materials. Oravec Dep., pp. 487–88.

## B. The Trump Grande Ocean Resort and Residences

The Trump Grande Ocean Resort and Residences are located in Sunny Isles Beach, Florida (the "Trump Resort").[6] The Trump Resort consists of three buildings. One is a hotel complex named the Trump International Sonesta Resort. The other two are virtually identical twin condominium buildings named the Trump Palace and the Trump Royale. Oravec claims that the Trump Palace and Trump Royale infringe upon his designs.

The Trump Resort project began in the 1990s when Defendant Michael Dezer bought a parcel of land located at 18001 Collins Avenue. *See* Michael Dezer Dep. (Def.Ex. 9), p. 23–24. Michael then teamed up with Colonial Ridge Development LLC ("Colonial Ridge") to develop the property.[7] In approximately 1997, Colonial Ridge hired the Sieger Suarez firm to design two buildings on the property. *See* Burstein Dep., p. 9, 15–16; Sieger Dep., p. 124, 127. The original Sieger Suarez design called for a round condominium hotel and a Y-shaped residential condominium. Sieger Decl. ¶ 4; Gil Dezer Dep., p. 18. This design was in place until November 1999. G. Dezer, p. 18. When additional property was acquired adjacent to the original site, Michael Dezer wanted to enlarge the project but the Colonial Ridge partners did not, so Michael Dezer bought out Colonial Ridge. M. Dep., p. 31; G. Dezer Dep., pp. 16, 19, 24. Within a few weeks or months of the buyout, the Dezers decided to build a larger residential condominium and instructed Sieger Suarez to alter the existing designs accordingly. Sieger Dep., p. 124, 127; G. Dezer Dep., 29–31; M. Dezer Dep., p. 41. The result, the design for the current Trump Palace, was substantially complete in March of 2000. *See* DE–197, Suarez

6. Trump had no connection with the project until 2001, but for convenience the Court will use "Trump Resort" to describe the project given its present name.

7. Robert Burstein, Howard Wilofsky and Sam Richter were the partners in Colonial Ridge. *See* G. Dezer Dep., p. 20.

Decl., Ex. C, (attached to Sieger Suarez Resp. in Opp. to Plf. Statement of Facts). Later, more adjacent property was purchased and the decision was made to build two residential condos that mirrored each other. G. Dezer Dep., 34; M. Dezer, p. 38. The second building is the Trump Royale. It is currently under construction.

At various points in time, the Dezer family created different entities to develop the three buildings that comprise the Trump Resort. Defendants concede that Defendant Sunny Isles Luxury Ventures L.C. is the current owner and developer of the Trump International Sonesta, the hotel portion of the project. G. Dezer Dep., p. 8. Defendant Residences at Ocean Grand, Inc. ("Residences"), is the current owner and developer of the Trump Palace. Silver Dep., pp. 42–43; G. Dezer Dep., p. 7, 40. Defendant Royale Florida Enterprises, Inc. ("Royale Florida"), is the current owner and developer of the Trump Royale. Silver Dep., p. 43; G. Dezer Dep., p. 7. It is unclear from the record precisely when these and the other Dezer entities were created, or what their exact roles where in the development of the Trump Resort. What is clear is that Michael and Gil Dezer were the individuals who approved the challenged Sieger Suarez designs on behalf of whichever entity was involved. *See* G. Dezer Dep., p. 135; M. Dezer Dep., p. 85.[8]

### C. The Trump Defendants' Involvement in the Trump Resort

In the spring of 2001, the Dezers contacted Donald Trump to see if he would be interested in licensing his name for use in connection with the Trump Resort. Trump Decl. ¶ 5; Michael Dezer Dep. 50–53. On December 2, 2001, Donald Trump executed a license agreement with Michael Dezer in which he agreed to license his name to the project, which would thenceforth be known as the Trump Grande Ocean Resort and Residences, with the two luxury condominium towers to be known as the Trump Palace and Trump Royale. Trump Decl., ¶ 6. Prior to the execution of the license agreement, in the spring or summer of 2001, Trump reviewed and approved Sieger Suarez's designs, which were then substantially the same as the final plans. *Id.*, ¶¶ 7, 9. Trump was not involved in the decision to change the shape of the Y-shaped condo to the current convex/concave design. G. Dezer Dep., p. 49; M. Dezer Dep., p. 83 ("Trump inherited the outside design from us").

### D. Defendants' Access to the Copyrighted Designs

Oravec began marketing his high-rise designs in mid–1996. First, Oravec enlisted the help of Tom Slingerland. *See* Slingerland Dep. (Def.Ex. 22), pp. 50–51. Slingerland worked with Oravec at Creative Displays and had contacts with various developers in South Florida. *See* Slingerland Dep., p. 55. He either delivered Oravec's materials to these developer contacts or arranged meetings with them. *See gen-*

---

**8.** Given the contentious dispute over which entities actually owned the property during the pertinent time period and stand to profit from it, and Oravec's lingering concern that the Dezers might divert funds from and between their many entities to avoid an adverse judgment, the parties tentatively agreed at the July 7, 2006, hearing that Gil and Michael Dezer would submit sworn affidavits identifying the true owners and developers as Residences and Royale Florida (which they already admitted in their papers) and averring that these entities would be able to meet any obligation arising from an adverse judgment. With that stipulation, the Court was prepared to dismiss the remaining entity Defendants. Since then, however, Defendants retracted their earlier agreement and requested the Court to rule separately on the potential liability of the individual entity Defendants.

*erally, id.,* pp. 55–75. In late 1996 or early 1997, Oravec hired a real estate lawyer named Neal Litman to assist in marketing his designs. *See* Litman Dep. (Def.Ex. 15), p. 14–15; *see also* Plf. Ex. 22 (March 25, 1997, engagement letter from Litman to Oravec). In addition to Slingerland and Liman's assistance, Oravec made direct mailings of his designs to as many as 120 individuals and companies between 1997 and 1999. *See* Oravec Dep., pp. 147–49. During that time, Oravec sent one of two different packages of designs to the various companies. *Id.,* pp. 148, 201–02, 251–60. He cannot be sure which package he sent to which company, and he kept no records of when he sent the packages. *Id., see also* pp. 375–77. Oravec mailed his designs to Donald Trump sometime in 1998 or 1999. *Id.,* p. 343, 356, 367–70. Oravec never sent a direct mailing to Sieger Suarez. Oravec Dep., p. 113–14, 444.

Although Oravec mailed materials to as many as 120 companies and individuals, and made a few presentations in person, his opposition to Defendants' motion focuses his copying allegations on four sources: (1) the Portofino Group, (2) Bill Eager, (3) Robert Burstein and (4) Donald Trump.

### (1) Portofino Group

Oravec believes Sieger Suarez had access to his designs which were left at the offices of the Portofino Group ("Portofino"). Oravec Dep., p. 53. The Sieger Suarez firm did have a professional relationship with Portofino during the pertinent time frame. In 1996 and 1997, Sieger Suarez provided design services for a joint venture, of which Portofino Group was the principal. *See* Plf. Ex. 34–35 (Sieger Admission., p. 3; Suarez Admission., p. 3). Sieger Suarez also provided design services for one or more other entities in which Portofino Group was involved. *See id.*

In all, Oravec had four or five meetings with the Portofino between mid–1996 and early 1998. *See* Oravec Dep., p. 76. No representatives of Sieger Suarez attended any of the meetings. *Id.,* p. 55; *see also* Sieger Decl., ¶ 13; Suarez Decl. ¶ 4. At the first meeting in 1996, Oravec met with individuals from the Portofino Group at Portofino's sales offices on South Point Drive in Miami Beach. Oravec Dep., pp. 56–60. Oravec brought with him drawings and plans, including those which he had copyrighted in 1996, along with an original model created earlier. *Id.,* pp. 58–59, 528–29. Oravec took the model with him after the meeting, but left the renderings and drawings in Portofino's sales office conference room. *Id.,* pp. 53, 528–29, 541. A few months later, Oravec had another meeting with Portofino at the same location, involving the same materials in addition to some new drawings based on Portofino's suggestions from the prior meeting. *Id.,* pp. 75–76. Oravec met with Portofino for a third time in 1997 at their headquarters offices on Washington Avenue in South Beach to discuss further layouts Oravec had produced. Oravec Dep., pp. 81, 87–88, 723. Finally, in early 1998, Oravec met with Portofino for the second time at the Washington Avenue offices. At this meeting he was told that the land had been sold to another developer and that Portofino was no longer interested in pursuing his design. *Id.,* pp. 94, 722. Oravec remembers that his proposals were in the Portofino conference room at the time but does not recall whether he left any additional materials at the last meeting. *Id.,* p. 761.

Both Charles Sieger and Jose Suarez admit visiting Portofino's sales offices at 1 South Point Drive in 1996–97. *See* Plf. Ex. 34–35, p. 4; *see also* Suarez Dep. (Def.Ex. 23), pp. 102–05, 132–33. Neither Sieger nor Suarez could admit or deny that they

visited Portofino's Washington Avenue office. Plf. Ex. 34–35, p. 4.

### (2) Bill Eager

Bill Eager is a landscape architect. Eager Dep. (Def.Ex. 11), pp. 6–8. In 1993, Eager, Charles Sieger, Jose Suarez and Ronald Gaines, began a landscape architectural firm called EGS2. Eager Dep., pp. 44–6. EGS2 and Sieger Suarez operate out of the same office space in Miami. *Id.*, pp. 10–11. Like Sieger Suarez, EGS2 did work for Portofino Group. *Id.*, p. 13. Also like Charles Sieger and Jose Suarez, Eager visited Portofino's offices as many as six times in 1996 and again in 1997. *Id.*, p. 19–20, 55. EGS2 was also retained to do work on the two Trump Buildings. *Id.*, p. 19. For example, Eager designed the pools, the fountain and the landscape plan for the Trump Buildings. *Id.*, p. 33, 38–40.

### (3) Robert Burstein

Robert Burstein is a principal in a company called Colonial Ridge Developers ("Colonial Ridge"). Burstein Dep. (Def.Ex. 6), p. 8. Colonial Ridge originated a proposed hotel venture on Collins Avenue in Sunny Isles Beach with Michael Dezer, which was the precursor to the Trump Resort project at issue here. *Id.; see also* Suarez Dep. (Def.Ex. 23), pp. 165–68. In the late 1990s, Colonial Ridge hired Sieger Suarez to be the architect for the precursor project. *Id.;* p. 16. Throughout that relationship, Burstein had direct contacts with Charles Sieger and Jose Suarez. *Id.*, p. 47.

A Dezer entity bought out Colonial Ridge in 1999 or 2000. *Id.*, p. 10. At the time of the buyout, the architectural plans for the Trump Resort were in progress. *Id.*, p. 14. According to Burstein, the design included two buildings, one was circular and one was Y-shaped. *Id.*, pp. 18–19. The currently disputed Trump Palace and Trump Royale were developed after Colonial Ridge was bought out. *Id.*, p. 48.

In the 1990s, before it was bought out, Colonial Ridge hired Creative Displays to work on the Trump Resort project. *Id.*, pp. 38–39. Burstein had worked with Creative Displays before, sometime between 1995–97, on a different project. *Id.*, p. 40. Because of that relationship with Creative Displays, Burstein was familiar with Tom Slingerland. *Id.* Slingerland testified that he delivered Oravec's designs to Burstein in 1996 or 1997. *See* Slingerland Dep., pp. 94–98. Slingerland did not speak with Burstein directly; he just left the designs with the receptionist. *Id.* Slingerland never followed up with Burstein about the design. *Id.* Burstein testified that he never received any designs from Slingerland. Burstein Dep., p. 45–46. Moreover, Charles Sieger and Jose Suarez both aver that Burstein never showed or discussed Oravec's materials with them. *See* Siegler Decl.,¶ 17; Suarez Decl. ¶ 8.

### (4) Donald Trump

In May of 1997, Litman sent a package with Oravec's designs to Jason Binn, who is a friend of both Litman and Donald Trump, so that Binn could deliver the designs to Trump. Litman Dep. (Def.Ex. 15), pp. 34–36, 54–55; Trump Dep. (Def.Ex. 26), p. 37. Although Binn could not specifically recall delivering the package, he believes he would have done so, especially because he was a friend and colleague of Litman. *See* Binn Dep., pp. 31–32, 50–51, 57–58. As mentioned before, in addition to Litman's efforts, Oravec also sent an unsolicited copy of his designs to Trump in 1998–99. Oravec Dep., pp. 343, 356, 367–70. Trump testified that if he received a package of architectural renderings, it is more than likely that he would have given them at least a quick review. *See* Trump Dep., 42–43. Trump, however,

denied that he ever saw Oravec's designs or that he passed on any designs to Sieger Suarez. *See* Trump Decl. (Def.Ex. 3), ¶¶ 2, 4; Trump Dep., p. 38. Trump did have connections with Sieger Suarez prior to 1996, but his subsequent relationship with them on the instant project did not begin until 2001.

### E. Trump Palace and Trump Royale

The design for the Trump Palace was substantially complete by March of 2000. *See* DE–197, Suarez Decl., Ex. C (attached to Sieger Suarez Resp. in Opp. to Plf. Statement of Facts). The Trump Palace is an approximately 40 story beach-front high-rise condominium building. The side of the building that faces the ocean is completely convex in shape. Three ovoid shaped elevator towers protrude outward from the ocean side of the building. The towers extend several stories above the roof line and have slanted tops. On the street side, between the outer two elevator towers, the center of the building's facade can be roughly divided into three vertical sections. The top and bottom sections are convex and the middle one is concave. However, the convex/concave segments do not extend across the entire front of the building, but only between the outer two elevator towers. The central elevator tower is visible in the center concave segment but not in the convex tiers above and below. The ends of the building, outside the outer towers, are rounded. The top of the lowest convex tier (at about the 17th floor) has an open see-through terrace area. Photographic images and a floor plan of the completed Trump Palace are attached to this Order as Exhibits C1, C2 and C3.

On February 15, 2003, Oravec saw an article in the *Miami Herald* featuring a photograph of a model of the Trump Palace. Oravec Dep., pp. 96–97. Oravec believed the Trump buildings looked like his designs, so the next day he went to the sales center for the Trump Resort and viewed models and brochures of the Palace and Royale buildings. *Id.,* pp. 97–98, 763–64. At that time, only the foundation of the first building, the Palace, had been laid. *Id.,* p. 97. Within weeks, Oravec contacted several lawyers about taking his case. Oravec Dep., pp. 439–41. After interviewing a few, Oravec engaged a Ft. Lauderdale law firm, but that firm withdrew in late 2003 because the case was too big for it to handle. *Id.,* pp. 442–3. In early 2004, Oravec made contact with and hired his current counsel. *Id.,* pp. 441–43. Oravec filed suit in November 2004, approximately 20 months after he saw the photos of the Trump buildings.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial burden is met, the non-moving party must go beyond the pleadings and "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. To survive

summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Indeed, a mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *see also Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

In assessing whether the parties have met their respective burdens, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor. *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir.2001). However, "[i]f the non-moving party fails to 'make a sufficient showing on an essential element of [his] case with respect to which [he] bears the burden of proof,' then the court must enter summary judgment for the moving party." *Id.* at 1181 (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

## IV. DIRECT COPYRIGHT IN-FRINGEMENT

To establish a *prima facie* case of direct copyright infringement, Oravec must prove two elements: (1) that he owns a valid copyright in the building designs in question, and (2) that Defendants copied original elements of the copyrighted materials. *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Calhoun v. Lillenas Publishing,* 298 F.3d 1228, 1232 (11th Cir. 2002). Defendants contest both prongs of Oravec's *prima facie* case as well as the creation dates of Oravec's designs.

### A. Copyright Creation Dates

As a threshold matter, because copyright infringement deals with illicit copying of protected work, the Court must first determine when each of Oravec's designs were created. If they were not completed before March of 2000, when the Sieger Suarez designs were substantially completed and on file in the public record (*see* Suarez Decl., Ex. C, attached to Sieger Suarez Resp. in Opp. to Pl. Statement of Facts), then Sieger Suarez could not have copied from Oravec. Oravec's certificates of copyright registration specify that the materials submitted with the 1996 and 1997 copyright applications were created in 1996, well before the Sieger Suarez designs were completed. There is no evidence in the record to contradict these creation dates and therefore, if there was access, Sieger Suarez could have copied these materials.

▮ In contrast, all of Oravec's remaining copyright certificates indicate that the accompanying materials were created no earlier than 2001, that is, *after* the Sieger Suarez designs were already complete. In particular, the 2002 certificate states that the materials were created in 2002, and the April 2004 certificate states that the materials were created in 2004. In fact, in his deposition, Oravec conceded that Defendants could not have copied either of these two sets of designs. Oravec Dep. p. 487–88. Therefore, there is no genuine dispute that Defendants could not have copied from Oravec's 2002 or April 2004 copyrighted material, and Defendants are entitled to judgment as a matter of law in their favor on any claims related to the 2002 and April 2004 copyright materials.[9]

---

9. As explained later, Oravec also abandoned whatever copyright protections he had in the 2002 designs. With the exception of discuss-ing this other basis for dismissal, the 2002 and April 2004 copyrights are excluded from the remaining analysis.

As for the March 2004 materials, the certificate of registration states that the materials were completed in 2001, after the Sieger Suarez designs were complete. This date of creation is accorded a presumption of correctness by the Copyright Act. *See* 17 U.S.C. § 401(c) ("In any judicial proceedings the certificate of registration ... shall constitute prima facie evidence of ... the facts stated in the certificate."). Notwithstanding the completion date on the certificate, in his deposition, Oravec testified that these materials were completed before 2001. *See* Oravec Dep., p. 551. As evidence, he points to computer file records which purport to establish the creation dates for these materials. *See id.*[10] Furthermore, Oravec explains that the 2001 creation date he included on the copyright application was the creation date of the *last* work submitted with the application. There is support for this position in a compendium issued in 1988 from the Copyright Office which states in pertinent part that "[i]n cases where several versions of a work are being registered together, the applicant should give the date of creation of the latest version." *See* Pl. Reply, Ex. N. Although the compendium guidance supports Oravec's explanation for the 2001 date he gave, there is no evidence that he actually re-

lied on the compendium or was even aware of it when he completed his copyright application. Moreover, the 2001 date Oravec included on the certificate as the latest creation date is inconsistent with his deposition testimony that the latest date was 2000. *See* Oravec Dep., p. 435.

In sum, although the computer file dates are persuasive evidence in his favor, the lack of the actual hard drives, coupled with the inconsistency in the prior creation dates he gave and the length of time he waited to file his application, raises a factual dispute as to the completion dates of these March 2004 materials and precludes summary judgment for Oravec on that issue.

### B. Copyright Validity

The parties cross-moved for summary judgment on the validity of the copyrights involved in this case. Altogether, Oravec submitted five copyright certificates. Four of them protect "architectural work," and one of them protects pictoral, graphic and sculptural works ("PGS works").[11]

■ "The *sine qua non* of copyright is originality." *Feist,* 499 U.S. at 345, 111 S.Ct. 1282. "Original, as the term is used in copyright, means only that the work was

10. At the July 7, 2006 hearing, Plaintiff's counsel brought copies of computer disks which contain the March 2004 designs. Those disks show that the materials were created or "last modified" on dates before the Sieger Suarez designs were complete. Defendants maintain that these dates are suspect because there is no evidence of creation dates on any of Oravec's computer hard drives. Defendants' computer expert Javier Lugo explained that there is no way to confirm whether the dates on the disks are legitimate because the dates could have been altered on the hard drive then copied to the disk. Without the hard drive there is no way of confirming the accuracy of the dates on the disks. Given this, the parties conceded at oral argu-

ment that there is a genuine factual dispute regarding the creation dates for the March 2004 copyrighted materials. For the purposes of the remaining analysis, the Court has assumed that the March 2004 materials were created when Oravec says they were.

11. Since 1990, architectural plans can receive two separate and distinct types of copyright protections. Section 102(a)(8) of the Copyright Act protects "architectural works," and Section 102(a)(5) protects "pictorial, graphic or sculptural work." The scope of protection for each type of copyright varies significantly, as discussed *infra.*

independently created by the author ... and that it possesses at least some minimal degree of creativity." *Id.* (citing 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990)) ("Nimmer"). Originality is an "extremely low" hurdle; "even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be' " *Id.* (quoting *Nimmer,* § 1.08[C][1] ). Indeed, possession of a copyright certificate is *prima facie* evidence of the validity and originality of the copyrighted material. *See Donald Frederick Evans & Assoc., Inc. v. Continental Homes, Inc.,* 785 F.2d 897, 903 (11th Cir. 1986) (citing 3 *Nimmer,* § 13.01[A] ); *John Alden Homes v. Kangas,* 142 F.Supp.2d 1338, 1344 (M.D.Fla.2001); *see also* 17 U.S.C. § 410(c).

Defendants do not dispute that Oravec authored his 1996 and 1997 designs and that he holds a copyright certificate for them. Thus, those copyrights are presumptively valid. As for the March 2004 copyright, the factual dispute over the creation dates of these designs precludes a finding that they were created before Oravec viewed the Trump designs and therefore no presumption of validity is possible at this time.

Notwithstanding the presumptive validity of Oravec's 1997 and 1998 copyrights (and the open question as to the March 2004 copyright), Defendants argue that none of Oravec's materials garner any architectural copyright protection at all. They contend (1) that since the March 2004 designs are registered as PGS material, not architectural work, the construction of the Trump Buildings cannot as a matter of law infringe that copyright; (2) that all three of the designs are too conceptual in nature and express only general ideas, functional elements and "*scenes a*

*faire*" which the Copyright Act does not protect; and (3) that none of the designs can be constructed into actual buildings as required to qualify as an architectural work. The first argument has merit; the remaining two do not.

**(1) The Trump Buildings Cannot Infringe on the March 2004 PGS Copyright**

■ Defendants first challenge Oravec's March 2004 PGS copyright. They argue that a PGS copyright cannot be the source of a copyright violation for the actual construction of a building based on the PGS work. This argument follows from § 113(b) of the Copyright Act which provides that a PGS copyright of a "useful article," such as a building, does not extend to manufacture of the useful article itself. Defendants argue that in the context of architectural designs, § 113(b) means that a copyrighted PGS work is not infringed by the construction of a building based on that work.

There is a long line of case law supporting Defendants' position that a PGS copyright protected the underlying design drawings from being copied, but did not prevent the construction of a building based on the plans. *See, e.g., Imperial Homes Corp. v. Lamont,* 458 F.2d 895, 899 (5th Cir.1972); *Desilva Constr. Corp. v. Herrald,* 213 F.Supp. 184, 195–96 (M.D.Fla.1962); *see also Nimmer,* § 2.08[D][2][a] ("a building is not a 'copy' of the underlying plans, with the result that construction of the structure does not constitute infringement.") (citing *Desilva*). Indeed, even after the Architectural Works Copyright Protection Act ("AWCPA") amended the Copyright Act in 1990 to include a new class of protection for "architectural work," expressly for the purpose of protecting against the copying of as-built architectural structures, courts

have continued to deny such protections for PGS copyrights. In *National Medical Care, Inc. v. Espiritu,* 284 F.Supp.2d 424, 433–35 (S.D.W.Va.2003), for example, the court concluded that building a structure depicted in a PGS work did not amount to infringement; only the drawings themselves are protected from copying. In so holding, the court stated that "[c]opyright protection only extends to as-built structures when the copyright is registered [as 'architectural work'] under the AWCPA," *Espiritu,* 284 F.Supp.2d at 435; *see also Nimmer,* § 2.08[D][2][a] (citing and discussing *Espiritu* with approval). More recently, the court in *Patriot Homes, Inc. v. Forest River Housing, Inc.,* No. Civ. 3:05–CV–0471–AS, 2006 WL 1752143, *8 (N.D.Ind. June 21, 2006), followed *Espiritu* and agreed that an as-built structure does not infringe upon the architectural drawings and plans that depict the design. Oravec has not cited any case law to the contrary.

■ Nevertheless, Oravec tries to circumvent this unbroken line of dispositive case law by noting that the March 2004 copyright is derivative of the 1996, 1997 and 2002 copyrights. He cites *In re Independent Services Organizations Antitrust Litig.,* 964 F.Supp. 1469, 1473 (D.Kan. 1997), for the proposition that a PGS derivative copyright of an earlier registered architectural work somehow invests the PGS work with the same copyright status as the earlier registered architectural work. Neither *Independent Services Organizations,* nor any other cases cited in the papers or at oral argument, supports this view. Rather, these cases hold that a properly registered derivative copyright may also include within its protections any prior works upon which the derivative work was based. In other words, on the facts of this case, the March 2004 derivative work might, at best, extend its PGS

protection backwards to also afford PGS protection for the earlier 1996, 1997 and 2002 works upon which the March 2004 designs were based. The reverse is not true. There is no legal support for the view that prior copyrights would extend their architectural work protections forward to encompass future derivative designs. Indeed, the federal regulations governing architectural works render this theory untenable. For example, the regulations provide for dual PGS and architectural work protections, as Oravec seeks here, but, importantly, provides that a *separate* registration is required for each. *See* 37 C.F.R. § 202.11(c)(4). Furthermore, the regulations require that *separate* registrations be filed for each architectural design, thus undermining the notion that a later, different but related design should get automatic protections. 37 C.F.R. § 202.11(c)(2). It is difficult to square Oravec's novel theory with the controlling regulations.

Perhaps seeing the writing on the wall, Oravec argued at the July 12, 2006, hearing that even if he cannot proceed with his March 2004 copyright on an architectural works theory, which had been his sole theory to that point, he should nevertheless be able to proceed on it as a PGS copyright violation. On such a theory, Oravec could not impose liability on Defendants for constructing the Trump Buildings, but instead for creating infringing PGS works (i.e., photos, models and brochures like those contained in the developers' advertising). While such a theory works in principle, because this never was his theory there is simply no evidence in the record that Defendants used Oravec's March 2004 designs to create infringing photos, models and the like. Because there is no evidence in the record to make out a *prima facie* case on the PGS infringement theory, Defendants are entitled

to summary judgment on the March 2004 copyright.

In an eleventh hour effort to keep the March 2004 designs in the case, on July 12, 2006 Oravec sought leave to file a Third Amended Complaint based on new copyright applications which he filed with the Copyright Office the day before, on July 11, 2006. The applications request protection for the March 2004 materials as architectural work rather than as PGS material. At the July 12 hearing, the Court denied leave to amend because the proposed amendment was based on *anticipated* copyrights which had yet to issue. Furthermore, the deadline for filing amendments to the pleadings passed well over a year ago. *See* DE–38 (February 3, 2004, Scheduling Order). With trial six weeks away, Plaintiff's delay is unreasonable, especially where Oravec has been on notice that Defendants challenged the adequacy of the March 2004 PGS copyright since April 10, 2006, the date Defendants filed their motion for summary judgment. *See Jennings v. BIC Corp.*, 181 F.3d 1250, 1258 (11th Cir.1999) (affirming denial of motion for leave to amend two months before trial and five months after the court's deadline for amendment).

### (2) Oravec's Designs are Sufficiently Concrete to Warrant Protection

■ Defendants also argue that none of Oravec's designs are protected under the Copyright Act because they are merely ideas or concepts. It is well settled that copyright does not protect ideas, only the tangible expressions of ideas. *See* 17 U.S.C. § 102(a)-(b) (Copyright protects "original works of authorship fixed in any tangible medium of expression"...but "[i]n no case does copyright protection for an original work of authorship extend to any idea, ... concept, principal or discovery, regardless of the form in which it is described ...."); *see also Feist,* 499 U.S. at 350, 111 S.Ct. 1282 ("[N]o author may copyright facts or ideas."); *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1248 (11th Cir.1999) (same). Thus, copying ideas is not infringement, so long as one does not trench on the particular expression of the idea. *See Feist,* 499 U.S. at 350, 111 S.Ct. 1282; *Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954).

■ Although the idea/expression dichotomy is easy enough to state, there is no simple formula for determining when an unprotected idea becomes concrete enough to be a protected tangible expression. The analysis is necessarily *ad hoc. Palmer v. Braun,* 287 F.3d 1325, 1330 (11th Cir.2002); *see also Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 122 (2d Cir.1930) (Hand, J.) (explaining that the line between an idea and an expression of an idea "will seem arbitrary" no matter where it is drawn). Nonetheless, several important doctrines help define the boundaries of the idea/expression dichotomy. For example, when an idea or concept can only be expressed in one or very few ways, the idea and the expression of it are said to merge, resulting in no copyright protection. *See Palmer,* 287 F.3d at 1330 (when "there are so few ways of expressing [an] idea, the idea and its expression merge ... and these few expressions do not receive copyright protection, since protection of the expressions would thus extend protection to the idea itself."). In addition to the merger doctrine, copyright law does not protect common themes, or *"scenes a faire."* A *scene a faire* is one of those elements of a subject that is as a practical matter indispensable, or at least standard, in the treatment of a given topic. *See Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 459–60 (11th Cir.1994) (there exists "no protection for common elements in police

fiction, such as drunks, prostitutes, vermin and derelict cars and foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop.") (discussing and quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986)). Similarly, in the realm of architecture, copyright does not protect utilitarian features or those which are dictated by external factors or mere functionality. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1296 (D.C.Cir.2002). Thus, in evaluating the scope of copyright protection, the courts must limit the protection to the particular concrete expression in the copyright and factor out those features that are too common, too generalized in application or merely functional.

■ In this case, Defendants make a broad attack on Oravec's designs, arguing that all of those allegedly original aspects of his designs are unprotected because they are either too conceptual or else nothing more than standard, commonly used, functional features not unique to high-rise buildings. For example, Defendants argue that the convex/concave form is too abstract and generalized to be monopolized by copyright. They equate Oravec's copyright with an impermissible attempt to copyright geometrical shapes. *Cf. Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d Cir.1959) (no copyright protection for circular, rectangular or octagonal shapes).

The Court agrees that copyright will not protect the mere idea of a convex/concave building, any more than it would protect the idea of an arch or dome or tower. *See Wickham v. Knoxville Intern. Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir.1984) ("The 'idea' of a tower structure certainly is not copyrightable."). But this does not mean that the particularized expression of a dome, arch or tower (or convex/concave building for that matter)

cannot be protected within the context of a particular design. *See Sturdza*, 281 F.3d at 1297 (finding that while domes and towers are not protectable in general, the plaintiff's specific use and expression of domes and towers in the context of her designs was protectable). Here, Oravec's designs employ the convex/concave shape in a distinctive fashion, especially when viewed in relation to the other aspects of his design, like the use of exterior elevator towers and the particular manner of stacking the floors. Most notably, the convex/concave segments in his designs envelope the exposed free standing elevator towers within the void created by the segments. And because the segments alternate, they create a "peek-a-boo" effect, alternatively obscuring and then revealing the elevator towers. Were it to be built, it would be an impressive structure; unlike any other building which the parties could reference. These particularized features, to name only a few, make Oravec's designs concrete manifestations of the abstract convex/concave concept.

Defendants also argue that Oravec cannot copyright his elevator towers because elevators are common features of any high-rise building. While the use of elevators is indeed unavoidable in any high-rise design, the particular expression of an elevator tower can warrant protection if it embodies some minimal level of originality. Here, Oravec is not trying to copyright high-rise elevators *per se;* he is trying to protect the particular expression of the elevator towers in his designs and the use of those exterior, free standing, cylindrical elevators towers within the context of his design as a whole. This particular use and arrangement of elevator towers as expressed within this design is sufficiently concrete and original to meet the minimal threshold required in copyright. In sum, Oravec's 1996 and 1997 designs exhibit

enough originality and substantive expression to satisfy the requirement for copyright protection.

### (3) No Constructability Test

█ In a related argument, Defendants challenge the validity of Oravec's designs by arguing that an "architectural work" as defined by the Copyright Act, "must mean a design from which a building could be constructed—or at least plans and drawings that are particularized and substantially complete." Sieger Suarez Opp. at 10. Defendants claim that because Oravec's 1996 designs lack floor plans, site plans, detailed drawings or indications of structural support, those drawings are too conceptual to qualify as architectural work. Similarly, Defendants contend that while the 1997 design has a floor plan, there are no dimensions, structural support, or other information to warrant protection.

There is no support in the statutory definition of "architectural work" for Defendants' constructability test. In fact, the text of the Copyright Act supports a more expansive view than Defendants' definition allows. The Copyright Act defines "architectural work" as

> the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101. Notably, the definition provides protection for the "overall form" and "arrangement" of a building, not merely the final construction plans. Thus, the text of the Copyright Act creates no constructability test. Indeed, the few courts to consider this question have rejected any such test. See Attia v. Society of the N.Y. Hosp., 201 F.3d 50, 57 (2d

Cir.1999) ("[W]e do not mean to suggest that, in the domain of copyrighted architectural depictions, only final construction drawings can contain protected expression."); see also Sparaco v. Lawler Matusky & Skelly Eng'rs LLP, 303 F.3d 460, 469 (2d Cir.2002).

Courts have found less concrete designs to be protected as architectural work. In Shine v. Childs, 382 F.Supp.2d 602, 609 (S.D.N.Y.2005), for example, the court found a "rough model" of a skyscraper created by an architecture student, sans internal designs or construction plans, to be protectable within the meaning of an "architectural work" because it "is more than a concept or idea; it is a distinctive design for a building." Oravec's designs are no less detailed or distinctive than the model at issue in Shine. In fact, Oravec's 1997 design includes different elevations and rudimentary floor plans, something missing from the design in Shine. As such, Sieger Suarez has not shown the designs to be so insubstantial as to deserve no protection as a matter of law.

### C. Copying

█ Having established that Oravec owns valid architectural copyrights in his 1996 and 1997 designs, the question becomes whether Oravec can meet his prima facie burden of showing that any of the Defendants copied them. Copying can be established either through direct or circumstantial evidence. Where, as here, there is no direct proof of copying, Oravec may nonetheless establish an inference of copying by demonstrating (1) that the Defendants had access to his 1996 or 1997 copyrights and (2) that the Trump Buildings are substantially similar to his designs. Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1247–48 (11th Cir. 1999); accord Calhoun v. Lillenas Publishing, 298 F.3d 1228, 1232 (11th Cir.

2002). Proof of access and substantial similarity raises a presumption of copying which then shifts to Defendants the burden of rebutting this presumption with proof of independent creation. *Calhoun,* 298 F.3d at 1232 (citing *Original Appalachian Artworks Inc. v. Toy Loft,* 684 F.2d 821, 829). Even if Oravec cannot demonstrate access to his design in order to establish the presumption of copying, he may still prove copying by showing that the Trump Buildings are so strikingly similar to his original designs as to preclude the possibility of independent creation. *Calhoun,* 298 F.3d at 1232 n. 6 (citations omitted). Here, Defendants contest the elements of access and substantial and striking similarities.

### 1. Access

Just as it is nearly impossible to offer direct evidence of copying, so is it often impossible to offer direct evidence that a defendant actually viewed the plaintiff's work. Therefore, in the Eleventh Circuit, the requirement that Defendants have sufficient "access" may be satisfied by showing that Defendants had "a reasonable opportunity to view" the copyrighted material. *Herzog,* 193 F.3d at 1249.

Regardless of the factual issue of when Oravec completed each of his designs, Defendants argue that they did not have reasonable access to the any of them, and therefore summary judgment is warranted. Defendants base their argument in large part on the authority of *Herzog v. Castle Rock Entertainment.* In *Herzog,* the court affirmed summary judgment for defendant where plaintiff's evidence fell short of meeting the "reasonable access" standard. Plaintiff claimed that John Sayles, a well-known screen author, actor and movie director, copied a screenplay she wrote while a student at the University of Miami. After one of her thesis committee members left the University, plaintiff approached two professors and asked them to serve on her committee. She gave them each a copy of her screenplay which they never returned to her. Because plaintiff never directly supplied Sayles with a copy, she argued that he must have received her screenplay through one of the professors Specifically, she claimed that while Sayles was in Miami for a film festival, he had the opportunity to meet the professors, who allegedly attended the same festival and were social acquaintances. Importantly, however, there was no evidence that the men met at the festival or elsewhere. Without some facts actually linking the men together while Sayles was in Miami, plaintiff had "established nothing more than the fact that [the professors] were in the same city as [defendant] during the 1993 film festival." *Id.* at 1251. That, however, was insufficient to raise an inference of access because "access may not be inferred through mere speculation or conjecture." *Id.* Indeed, the court explained that "an inference of access based on a third party's possession of the plaintiff's work requires more than a mere allegation that someone known to the defendant possessed the work in question." *Id.* at 1252. (internal quotation and citation omitted).

The Court agrees with Defendants that *Herzog* disposes of most of the possible routes of access from Oravec's mass mailings and presentations. Even though there are facts linking Oravec's designs to certain South Florida developers and other facts connecting Sieger Suarez to the developers, there is very little that links *Oravec's designs* to Sieger Suarez. There must be some reasonable explanation of how a design in a third-parties' hands could have made it to Sieger Suarez, before Oravec can establish reasonable access. With respect to most of the mailings and presentations, Oravec does not even

try to make a reasonable explanation. Instead, he focuses on access from four sources: Portofino Group, Bill Eager, Robert Burstein and Donald Trump. The Court agrees that a genuine issue of material fact exists with respect to Portofino, Eager and Burstein, but not Trump.

First, the undisputed evidence is that both Charles Sieger and Jose Suarez worked for and paid several visits to the Portofino Group's offices in Miami Beach in 1996, and possibly between 1997 and 1998, the same years that Oravec left copies of his designs in the conference rooms at Portofino. Oravec testified that he left the materials for months at a time. Because the undisputed evidence creates a genuine likelihood that Sieger and/or Suarez were in the same office as Oravec's designs, the Court cannot rule as a matter of law that no reasonable possibility of viewing the designs existed. *See Arthur Rutenberg Homes, Inc. v. Berger*, 910 F.Supp. 603, 608 (M.D.Fla.1995) (denying defendant's motion for summary judgment in copyright infringement case because defendant's employee visited sites where the disputed floor plans were posted on the wall; a reasonable jury could conclude this was reasonable access to plans).

Second, Bill Eager worked in the same Portofino offices where the designs were left between 1997–98. Because Eager, Sieger and Suarez shared office space in Miami, and are partners together in the ESG2 company, a reasonable opportunity existed for Sieger Suarez to view Oravec's materials through Eager. *See Arthur Rutenberg Homes, supra.* Third, as to access through Burstein, the evidence viewed in a light most favorable to Oravec shows that Oravec's designs were delivered to Burstein's office and that Burstein and his partners originally hired Sieger Suarez as the architects for what later became the Trump Resort. Burstein testified that he

had direct access to both Charles Sieger and Jose Suarez, which would be a reasonable inference in any event because he hired them as the architects for the project. Although Burstein denies that he received Oravec's designs or passed them on to Sieger Suarez, resolution of that fact question is for the jury, not the Court on a motion for summary judgment. *See Anderson*, 477 U.S. at 242, 106 S.Ct. 2505.

Finally, as to Trump, while there is a genuine issue of material fact about whether Trump ever received Oravec's designs, there is no evidence to establish reasonable access from Trump to Sieger Suarez. Trump did not become involved in the disputed project until 2001, after Sieger Suarez had substantially completed the challenged designs. The only other probative evidence in the record shows that Trump and Sieger Suarez worked together on a project prior to 1996, that is, prior to the time Oravec created his first design and could have mailed it to Trump. Thus, there is no evidence of access to Trump during the pertinent time period and therefore no reasonable connection between the designs and Sieger Suarez.

### 2. Substantial Similarity

 In addition to showing reasonable access, Oravec has the burden of establishing that Sieger Suarez's design is substantially similar to his. The substantial similarity test involves an extrinsic test and an intrinsic test. *Herzog*, 193 F.3d at 1257. Under the extrinsic test, the Court must consider, from an objective point of view, whether the works are substantially similar in protected expression. *Id.* If there are no similarities, or the similarities involve only unprotected elements of the work, then summary judgment is appropriate. *Id.* As part of the extrinsic analysis, "expert testimony and analytic dissection are appropriate." *Id.* The intrinsic test

involves a more holistic view of the competing designs, comparing their "overall look and feel." *Sturdza*, 281 F.3d at 1296; *Cornerstone Home Builders, Inc. v. McAllister*, 303 F.Supp.2d 1317, 1320 (M.D.Fla. 2004). While issues of similarity are usually left for the jury to decide, *see Beal*, 20 F.3d at 454, if the Court is convinced that no reasonable jury could return a verdict in Oravec's favor, the Court has a duty to grant summary judgment. *See Wickham v. Knoxville Intern. Energy Exposition, Inc.*, 739 F.2d 1094, 1097–98 (6th Cir.1984) (affirming summary judgment for lack of substantial similarity between competing architectural designs).

In evaluating substantial similarity in this case, the Court has viewed the competing designs side by side to identify and evaluate their shared characteristics. Specifically, with the parties' assistance, the Court has compiled a list of elements in Oravec's design which he alleges evidence substantial similarity. The Court has then evaluated those elements to determine whether they are features which copyright protects. Finally, the Court has analyzed these elements, individually and collectively, to determine whether there is enough similarity so that a reasonable jury, properly instructed, could return a verdict for Oravec that the designs are substantially similar.[12]

Oravec claims that Sieger Suarez's Trump Palace and Trump Royale designs are substantially similar to his 1996 and 1997 designs in the following ways: (1) they both use alternating convex/concave vertically stacked forms, (2) they both use three prominent elevator towers that protrude above the roof line, (3) they both use rounded ends on their buildings, (4) they both use a constant radius on the individual floor plans, (5) they both use a twin tower design, (6) they both have a circular plaza, and (7) they both include full see-through units.[13] The convex/concave segments and the elevator towers are the key distinctive features which the parties focus on and will be discussed first.

**(a) Convex/Concave Concept**

As previously discussed, at the very least, Oravec's unique use of the stacked alternating convex/concave segments, and the free standing elevator towers within the void space of the structure, are sufficiently original and concrete in expression to be protected by copyright. *See, supra*, § IV.B. Furthermore, as for whether his 1996 and 1997 materials are substantially similar to the Trump Buildings, it can fairly be said that the competing designs both employ a convex/concave concept and both make use of three partially exposed elevator towers that protrude above the roof line. Beyond that generalized similarity though, and in particular with respect to the tangible expression of those design concepts, the differences between the designs are palpable; so much so that no

**12.** The parties have each filed expert reports to bolster their view of the substantial similarity question. Predictably, the experts reach opposite conclusions. Oravec's expert sees the designs as not only substantially similar but strikingly so. *See* Brown Report (Pl.Ex. 16), p. 42. Defendants' expert claims just the opposite. *See* Steffens Report (Pl.Ex. 67), p. 14 ("the Trump Palace and the Trump Royale buildings ... not strikingly or comprehensively substantially similar to any version of the design claimed by Mr. Oravec."). While their ultimate conclusions are not particularly helpful because the experts have no reliable method of making the legal determination of substantial similarity, the reports have been somewhat useful in identifying and articulating the similarities and differences in the competing designs. That the experts reach opposite legal conclusions is not enough to create a jury issue.

**13.** By "see-through" the Court understands the parties to mean that each unit has views out opposite sides of the building, for example, both east and west views.

reasonable jury could find the competing designs substantially similar. The first major difference is that Oravec's design uses the convex/concave formula on both sides of his structure, while the Trump Buildings employ the concept only on the street side of the building. *Compare* Ex. A1–2 and B1–2 *with* C1–2. Even on that one side, the Trump Buildings use only three convex/concave segments, while Oravec uses five. *Compare* Ex. A1–2 and B1–2 *with* C–2. Most striking is the fact that Oravec's entire floor plan is a convex or concave "banana" shape, while the Trump Building floor plans are more rectilinear and only show the convex or concave aspect on its facade. See Ex. D–1 ("Floor Plan Comparisons"). Additionally, Oravec's convex and concave floor segments are much longer and narrower than Trump Buildings. Oravec's 1997 design has a length of 320 feet and a floor width of 42 feet, giving the distinct impression of a banana-shaped floor plan. *See id.* The Trump Buildings, by contrast, measure only 260 feet long and 72 feet wide at their narrowest points, creating a more box-like floor plan with a much less pronounced curve to it.[14] *See id.* This difference drastically alters the overall look and feel of the design. The point is even more dramatically revealed when Oravec's design is viewed from the side elevation. *See* Ex. D–2. There, one sees that the Oravec floor plates shift back and forth between the vertical center line as one looks from top to bottom. None of this is expressed in the Trump Buildings; each segment is solid on both sides of the center line.

### (b) Elevator Towers

Oravec also maintains that the Trump Buildings' elevator towers are substantially similar to his. Aside from the basic observation that both designs have three towers that extend above the roof line, the elevator towers exhibit no particularized similarities in expression. First and foremost, Oravec's elevators are free standing. They uniquely exist within the void created by the alternating convex/concave segments. In stark contrast, the elevator towers in the Trump Building design exist within the solid space of the building itself. *Compare* Ex. A1–2 and B–2 *with* C1–3. Only the front and back ends of the towers are exposed to view. While Oravec's elevator towers rise up out of a hollow center, the Trump Building towers are encased within the solid structure. And because the convex/concave segments alternate, a viewer of Oravec's building can only see certain sections of the otherwise obstructed elevator towers. A viewer of the Trump Buildings, on the other hand, sees the exterior of the outer two elevator towers throughout the entire street elevation of the building. Only the center tower is obstructed by the upper and lower sections of the concave segments in the Trump Building design. The differences do not end there. Oravec's elevator towers are cylindrical. The Trump Building elevator towers are ovoid. In addition, the outer two elevator towers in the Trump Building designs are angled inward so that the leading edge of all three towers orient toward a focal point outside the building. Because the Oravec towers are cylindrical, they lack this characteristic altogether. Moreover, while the tops of the towers in both designs extend above the roof line, the Trump Building towers have sloped roofs, giving them the effect of the smoke stack on a cruise ship.

### (c) The Remaining Elements of Oravec's Designs

Oravec's use of a twin tower design, rounded ends, constant radius sides, circu-

---

14. In addition, the Trump Buildings are 11 feet wider at the top than at the base, creating a vase-like aspect which is not present in the Oravec design.

lar plaza and see-through units are not copyrightable architectural design elements. Each of these elements are either common themes or standard features in the realm of architecture. More importantly, even if they were protectable elements, the particularized expression of these features in the Oravec designs are not substantially similar to the Trump Buildings. For example, Oravec's twin towers have the unique aspect of inverting the convex/concave elements so that one building appears as though it would fit into the other if they were pushed together.[15] This feature is lacking altogether in the Trump Buildings, which are virtually identical copies of each other. The rounded ends take on a different expression too because Oravec's floor plans are longer and narrower than the Trump Buildings. See Ex. D–2. Therefore the "roundness" that the competing designs share exists only in a generalized way. In addition to the geometrical differences in the rounded ends, Oravec's 1997 design has floors with full walk-around terraces, while the Trump Building has individual balconies. The balconies create "cut-outs" in the rounded ends so that they are not uniformly round.[16] See id. Turning to the circular plaza, Oravec's plaza lacks any of the details expressed in the Trump design to be substantially similar. For example, Oravec's plaza lacks the detailed rosettes and other intricate patterns expressed in the Trump plaza designs. And finally, the full see-through aspect of the designs differ precisely because the floor plans themselves are different. In sum, because of these substantial differences in actual ex-

pression, the only way these particular design elements—the twin tower configuration, the rounded corners, and the see-through feature—can be said to be similar is in an abstract and conceptual way, which copyright does not protect.

### (D) Too Many Modifications Are Required to Make the Designs Similar

At oral argument, Oravec candidly conceded the main differences in expression described above. He nonetheless argued that he can prove the similarities in the designs by showing how easy it is to transform his design into the Trump Buildings.[17] This is accomplished by (1) taking off the top two tiers of his design; (2) modifying the elevator towers; (3) raising up the building elevations; and (4) "filling in" the floor plates. Significantly, the modification processes which he describes underscore the significant differences between the designs. For example, "modifying" the elevator towers means making them ovoid rather than cylindrical, making them "fatter," making them "flow through" the building rather than stand alone, and making their tops slanted rather than flat. To say the elevator towers here are substantially similar despite the significant changes it would take to make them look alike is tantamount saying that Oravec's copyright gives him a monopoly on using three elevator towers that are expressed on the outside of a building, regardless of whatever other dramatic differences they have. Copyright protections do not extend this far. In *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094,

---

**15.** This uniqueness is a product of the convex/concave nature of the design rather than its being a twin tower *per se.*

**16.** One of Oravec's experts noted this difference in his comparative report. *See* Brown Report, p. 30, Table 2.

**17.** At the hearing, Oravec's counsel showed a computer animation in which Oravec's design was modified into an approximation of the Trump Buildings.

1097 (6th Cir.1984), for example, the court affirmed summary judgment on the ground that competing tower designs were not substantially similar. The court noted that "[o]nly by significantly altering the plaintiff's designs could any similarity be shown." *Id.* To find substantial similarity despite such differences would be to condone a copyright on the mere idea of a tower, which copyright does not permit. *See id.* (citing *Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954)).

This same analysis applies to the convex/concave concept expressed in both designs. Oravec would have to change the length, width and proportions of his floor plans entirely to make them similar to the Trump Buildings. Moreover, Oravec would have to remove two of his segments (about the top third of his design) to create a the right number of segments. He would also have to eliminate the convex/concave aspect altogether from one side of his design. These are not minor modifications but radical changes that completely alter not only the individual features but the overall look and feel of the building. As with the elevator towers, the concrete expression of the convex/concave concept is so different between the competing designs that to find substantial similarity would require holding that Oravec owns a monopoly over the use of any convex/concave formula in architectural design. That result would be antithetical to the essential purpose of copyright, which "is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist,* 499 U.S. at 349, 111 S.Ct. 1282 (quoting U.S. Const., Art. I, § 8, cl. 8.). That is why "copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id.* at 349–50, 111 S.Ct. 1282 (citing *Harper & Row,* 471 U.S., at 556–557, 105 S.Ct. 2218, 85 L.Ed.2d 588). As such, even if Oravec could convince a jury that there was access to his designs (a point on which the Court expresses no opinion), he still could show no more than that Sieger Suarez took his original concept of using convex/concave forms along with three towers and transformed it into a unique building of their own. Simply put, the similarities between the competing designs exists only at a conceptual level. No reasonable jury, properly instructed, could find substantial similarity between the designs without implicitly, and impermissibly, finding that Oravec owns a copyright in an idea.[18] Accordingly, Defendants are entitled to summary judgment in their favor as to the 1996 and 1997 designs for lack of substantial similarity.

## V. SECONDARY COPYRIGHT INFRINGEMENT

 Under the copyright laws, liability extends beyond those who directly copy the work and may include those who have control of or substantially assist in the infringement and profit from it, regardless of whether they actually copied anything. These secondary theories of liability are known as contributory and vicarious infringement. *See MGM Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 125 S.Ct. 2764, 2776, 162 L.Ed.2d 781 (2005). Here, Oravec seeks to impose liability on the various developer Defendants based on theories of contributory and/or vicarious liability.

18. Because the Court finds that there is no substantial similarity between the Trump Buildings and Oravec' 1996 and 1997 designs, even when viewing those designs in the light most favorable to Oravec, the Court need not reach the question of striking similarity or independent creation.

## A. Vicarious Infringement Liability

■ To establish a *prima facie* case of vicarious infringement, Oravec must establish: (1) that Defendants profited from the architect's direct infringement, and (2) that Defendants had the right to stop or limit the infringement but did not. *Grokster*, 125 S.Ct. at 2776; *see also Playboy Enterprises, Inc. v. Starware Publishing Corp.*, 900 F.Supp. 438, 440–41 (S.D.Fla.1995). As pertains to the development of allegedly infringing architectural work, courts have held the corporate owner of the construction project liable on the theory of vicarious infringement even though the owner did not directly copy the work himself. *See Nelson–Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505, 513 (4th Cir.2002); *see also Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Const. Co.*, 542 F.Supp. 252 (D.Neb.1982).

### (1) Michael and Gil Dezer

Michael and Gil Dezer moved for summary judgment on Oravec's vicarious infringement claim, arguing that they cannot be liable because they are not the owners or developers of the Trump Buildings and will not directly profit therefrom. In contrast, they assert that the owner and developer of the Trump Palace is Residences of Ocean Grande, Inc. ("Residences"), and the owner and developer of the Trump Royale is Royale Florida Enterprises, Inc. ("Royale Florida"). *See* Trump and Developer Def. Mot. at 15–16.

Oravec counters with evidence that Michael and Gil Dezer have been actively involved in the development of both the Trump Palace and Trump Royale. For example, Michael and Gil admitted in another lawsuit that they control Royale Florida, the company which they concede owns and developed the Royale building. *See* Melody Answers (Pl.Ex. 11), ¶¶ 4–5. In fact, Michael testified in that case that

all of the owners and developers of the Trump Palace and Trump Royale work for him. *See* Melody Dep. (Pl.Ex. 10), p. 37–38. Most importantly, Michael and Gil approved the change of the architectural designs from the original round and Y-shaped buildings to the current designs that Oravec claims are his. *See* M. Dezer Dep. (Def.Ex. 9), pp. 30–31, 41; G. Dezer Dep. (Def.Ex. 8) p. 49, 131–32.

As for profits, Gil Dezer's answer to the Complaint admits that he "has substantial financial interest … in the profit and success of the Trump Grande Ocean Resort and Residences." Answer (Pl.Ex. 12), ¶ 47. Michael too, as an owner of the various corporate entities, stands to profit from the development of the Trump Buildings. In sum, after reviewing the evidence in the record in the light most favorable to Oravec, the Court finds that a genuine question of material fact exists as to Michael and Gil Dezer's authority to control the allegedly infringing conduct and their likelihood to profit from it. As such, their motion for summary judgment must be denied.

### (2) Residences at Ocean Grande, Inc., Royal Florida Enterprises, Inc. and the Remaining Dezer Entities

Defendants concede that Residences and Royale Florida are the owners and developers of the Trump Palace and Trump Royale respectively. As such, if there is direct liability, then Residences and Royal Florida will naturally be exposed to vicariously infringement liability. They both controlled the ultimate design of the buildings, either directly or through their predecessor entities, and profited, or stand to profit, from the eventual sales of the buildings. Defendants do not dispute this reality. At the July 7, 2006, hearing they conceded that Residences and Royale Florida are proper party defendants in

this case and that Royale Florida could be added as a defendant in place of Royal Development Holdings Inc.[19]

As for the remaining entity Defendants—Sunny Isles, Dezer Properties and Dezer Development—the Court is not satisfied that the record is complete enough to dismiss any of them. While Oravec possesses only limited evidence as to their roles in the ownership and development of the Trump Buildings, the Defendants do not appear to have produced the financial documentation one would expect for a development project of this scale. *See* Dudney Report (Pl.Ex. 20), pp. 6–7. Given the allegations of discovery abuse and the pending motion for sanctions based on Defendants' alleged failure to disclose financial documents, the Court is not confident that summary judgment is justified at this time.

### (3) The Trump Defendants

The Trump Defendants move for summary judgment based on the argument that they had no ability to prevent or limit any direct infringement. They explain that they did not even begin negotiating the license agreement that brought Trump into the project until after Sieger Suarez completed the designs. Michael and Gil Dezer also admitted that Trump had no say in the exterior designs. *See* G. Dezer Dep., p. 49; M. Dezer Dep., p. 83 ("Trump inherited the outside design from us").

Orevac responds that Trump clearly has a financial interest in the buildings by virtue of the licensing agreement. Oravec also contends that the license agreement gives Trump the ability to approve (or

disapprove) the designs. While the agreement does give approval rights to Trump, and he did in fact approve the designs, the fact remains that as a practical matter he could not have changed the exterior of the Trump Palace at the point in which he received those contractual rights. Construction on the Trump Palace was already underway at that time. In contrast, construction on the Trump Royale had not begun. Thus, Trump could have exercised his rights to disapprove that design and seek a new one for the second building. Accordingly, the Court finds that the Trump Defendants did not have the right to stop or limit the implementation of the exterior design of the Palace but did have the right to stop or limit the design with respect to the Royale. Accordingly, the Trump Defendants' motion for summary judgment is granted as to the Trump Palace but denied as to the Trump Royale.

### B. Contributory Infringement

■ To establish a *prima facie* case of contributory infringement, Oravec must establish: (1) a direct infringement, (2) that the Trump Defendants had knowledge of the direct infringement and (3) that the Trump Defendants intentionally induced, encouraged or materially contributed to the direct infringement. *Grokster*, 125 S.Ct. at 2776; *CoStar Group, Inc. v. Loopnet Inc.*, 373 F.3d 544, 550 (4th Cir.2004); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.2004).

■ As discussed above in § IV.C.1, Oravec's first basis to hold the Trump Defendants liable for contributory infringement, (i.e., that Trump allegedly

---

**19.** Even though Royale Florida was not a named Defendant in the case, Royale Florida is the successor in interest to Royal Development Holdings Inc., who was named, and can be substituted in place of Royal Development. *See* Fed. R. Civ. P 25(c) ("In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.")

gave Oravec's design to Sieger Suarez), is without merit. In the alternative, Oravec argues that the Trump Defendants contributed to the direct infringement through their monitoring of the progress of the Trump Project and their insistence on the "Trump Standard." In particular, Oravec claims that Trump insisted on higher ceilings in the units, which in turn increased the height of the building. Even if Trump's conduct increased the height of the building, this contribution to the design is immaterial to the allegedly infringing elements of the building. There is no evidence that Trump's conduct contributed to the convex/concave elements, the distinctive elevator towers, or any other exterior element except perhaps the overall height of the building. Furthermore, it is undisputed that Trump did not sign the license agreement or even begin negotiating with the developers, until after the exterior design was substantially complete. Thus, the Trump Defendants could not have induced the direct infringement on this record. Accordingly, the Court grants summary judgment in the Trump Defendants' favor on the claim for contributory infringement.

## VI. Causation and Infringer's Profits

■ Relying on cases such as *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 521 (4th Cir.2003), Defendants argue that they are entitled to summary judgment on the issue of infringer's profits because (1) there is no conceivable connection between their alleged infringement and any revenue accruing to them from the alleged infringement of Oravec's copyrights, and (2) even if there is a conceivable connection between the infringement and the revenue, the actual evidence of damages is supported by nothing more than speculation. To recover infringer's profits in a copyright case, the owner of the copyright need only present evidence

of the gross revenue of the infringer. *See* 17 U.S.C. § 504(b). Once established, the burden shifts to the defendant to establish their "expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*

■ *Bouchat,* and the cases on which it relies, establish that a plaintiff must proffer some reasonable connection between the infringement and gross revenue. For example, a plaintiff cannot show a causal connection by simply lumping *all* sales revenues of a retailer together, if the retailer's infringement relates only to one item that is a small part of overall sales. *See On Davis v. The Gap, Inc.,* 246 F.3d 152 (2d Cir.2001). Instead, the plaintiff must establish gross revenue from the sales of items related the infringement. The *On Davis* court illustrated the relative burdens of the parties with the following example:

> if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume.

*Id.* at 160. Here, Oravec has shown the total revenue from sales of the infringing building itself. While the allegedly in-

fringing exterior design may only contribute to a portion of Defendants overall revenue from sales of the building, there is no doubt that the exterior design is so interwoven with the building as a whole that, like the anthology which contains the infringing poem, sale of the building amounts to sale of the infringing design in a way to meet the needed "conceivable connection" standard of *Bouchat.*

Other cases Defendants stressed at oral argument are distinguishable. *Mackie v. Rieser,* 296 F.3d 909 (9th Cir.2002), *Andreas v. Volkswagen of Am., Inc.,* 336 F.3d 789 (8th Cir.2003), and *Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700 (9th Cir.2004), are all cases where an advertisement for a product contained an infringing element *unrelated* to the product actually sold by defendant. As such, there was a live dispute about what relationship, if any, existed between the infringing ad slogan in *Andreas,* for example, and the ultimate sale of the defendant's sports car. Defendants in these cases could legitimately assert that copying a slogan had no conceivable connection to whether any consumers actually bought the advertised cars, and thus generated revenue attributable to the infringement. In this case, by contrast, the alleged infringement was not merely used to advertise an unrelated item. Rather, the infringement goes to the heart of the object sold and is therefore ineluctably tied to the revenues derived from its sale.

As for evidence of revenue, Oravec has proffered expert testimony regarding the total revenue from sales of the Trump Buildings. *See* Pl.Ex. 20. While total sales revenues certainly cannot be attributed to Oravec's design alone, he need not parse out which revenues are attributable to his design and which are attributable to other elements like the luxurious interiors, the views, or the Trump name. That burden falls on Defendants by operation of the burden shifting mechanism of § 504(b).

## VII. DEFENDANTS' AFFIRMATIVE DEFENSES

### A. Laches

Defendants next argue that Oravec's claims are barred by the doctrine of laches. Laches is an equitable doctrine that prevents unfairness to a defendant owing to plaintiff's unreasonable delay in filing suit. *See Venus Lines Agency v. CVG America, Inc.,* 234 F.3d 1225, 1230 (11th Cir.2000). To establish a laches defense, Defendants must show that (1) Oravec delayed in asserting his claims, (2) his delay was not excusable, and (3) Defendants were unduly prejudiced by the delay. *Id.* Here, Defendants argue that Oravec's twenty month delay between the time he discovered the alleged infringement and the time he filed suit meets the standard for barring his claims under laches. By the time Oravec filed suit, construction of the Trump Palace was all but completed Defendants assert that Oravec has no excuse for his delay and that had they known about Oravec's allegations they "could have considered alternative options as to the project and perhaps obviate[d] the claim." Dev. Def. Br. at 36.

The statute of limitations on a copyright claim is three years. 17 U.S.C. § 407(b). Oravec filed his lawsuit within two years. There is a split among the circuits about whether laches is a viable defense where the copyright holder files his case within the statutory period. Compare *Danjaq LLC v. Sony Corporation,* 263 F.3d 942, 954 (9th Cir.2001) ("If a defendant can show harm from the delay, the court may, in extraordinary circumstances, defeat the claim based on laches, though the claim is within the analogous limitations period") (citation omitted) with *Lyons Partnership v. Morris Costumes, Inc.,* 243 F.3d 789, 797 (4th Cir.2001) ("in connection with copyright claims, separation of powers

principles dictate that an equitable timeliness rule adopted by courts cannot bar claims that are brought within the legislatively prescribed statute of limitations"). The Eleventh Circuit has yet to address the subject. That question need not be answered here, however, because Defendants have not shown inexcusable delay nor undue prejudice.

■ First, as soon as Oravec leaned of the possibility of infringement in February of 2003, he investigated the potential claim by seeking out the design of the Trump buildings and comparing them to his designs. As the undisputed facts show, within weeks Oravec had contacted several lawyers about taking his case. He engaged a firm from Ft. Lauderdale, but it later withdrew because the case was too big for it to handle. Then, in early 2004, Oravec hired his current counsel. During this time, Oravec learned that he had to register his works before he could file suit, which he did. The need to obtain counsel capable of handling the case, to properly investigate the clams and to register his designs easily justifies the 20 month window between discovering the alleged infringement and filing suit, especially when the lawsuit was filed well within the statutory time limit.

Second, Defendants have not shown undue prejudice. With respect to Sieger Suarez, there is no claim of prejudice at all. With respect to the developers, other than saying that they could have "considered other [unidentified] options," they leave the Court to guess what they would have done had they known of the claims earlier. Given that Defendants continued with the Trump Royale project, which had yet to break ground before the suit was filed, there is little to suggest that Defendants would have done anything different than proceed with the Trump Palace as they did. *See* G. Dezer Dep., p. 123–24 (explaining that Defendants did not delay construction because they saw no merit in the suit). Because there is no genuine issue of material fact and the undisputed evidence shows that there was no undue delay or prejudice, the Court denies summary judgment as to Defendants and grants summary judgment in favor of Oravec on the laches defense.

## B. Oravec Abandoned any Copyright Interests in his 2002 Design.

The parties cross-move for summary judgment on Defendant's affirmative defense of copyright waiver. "In copyright, waiver or abandonment of copyright 'occurs only if there is an intent by the copyright proprietor to surrender rights in his work.'" *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* ¶ 13.06 (2000)). That intent must be manifested by some overt act. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1114 (9th Cir.1998). In *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739 F.Supp. 1392, 1398–99 (C.D.Cal.1990), for example, the court found that plaintiff's statement that "the information contained in this [copyrighted] letter is protected by U.S. copyright laws through noon EST on the 2d day after its release...." The court found plaintiff's expression to be a clear manifestation of its intent to abandon its copyright protections after two days, and granted partial summary judgment for defendant, despite plaintiff's submission of a declaration stating that its intent was otherwise. *Id.* Oravec manifested a similar intent with respect to his 2002 materials.

■ As part of Oravec's 2002 submission of his work to the Lower Manhattan Development Corporation (LMDC), Oravec abandoned any copyright protections that he otherwise had in his work. The application process required applicants like Oravec to acknowledge that they main-

tained no copyright protections in the work they submitted for the World Trade Center competition. Thus, Oravec signed a letter to LMDC stating that he "reserve[d] no patent, trademark, copyright, trade secret, or other intellectual property rights in any of the material that forms or is contained in [his] proposal." From this, Defendants argue that Oravec clearly abandoned or waived any interests in all of his design work relative to this case.

In response to this argument, Oravec claims that it never was his intent to abandon or waive any copyright protections and that his intent is, at least, a question of fact for the jury. He also argues that the language of the release only relates to the particular proposal in issue, i.e., the World Trade. Center designs, not all of his past or future designs. The Court agrees with Oravec that this letter covers only his World Trade Center design, but the Court agrees with Defendants that the language of the letter, which Oravec conceded that he signed and returned to LMDC, clearly and unambiguously manifested his intent to abandon any copyright protection over that particular design. In opposition, Oravec has submitted a declaration stating that he never intended to abandon any rights in his designs. However, his self-serving declaration cannot defeat a properly supported motion for summary judgment. *See Haladay, supra.*

**C. Oravec is Not Barred From Recovery Under the Copyright Act for Alleged Violations of Florida Statutes Regulating the Conduct of Architects.**

 The parties also cross-moved for summary judgment on the affirmative defense that Oravec may not recover under the Copyright Act because he allegedly violated certain Florida statutes governing the conduct of architects. Defendants argue that Oravec should not be permitted to profit under the Copyright Act because he acted illegally in practicing architecture and holding himself out as an architect in Florida without a license. *See* Fla. Stat. § 481.223.[20]

This argument fails for several reasons. First, nothing in the Copyright Act limits its protections to licensed architects. In fact, the Act protects original works of architecture without reference to the status of the creator. Although neither party cited any case law on point, Oravec points to language in the legislative history supporting his view that the 1990 AWCPA amendments adding architectural protections were designed to protect architectural works, "without regard to professional training or state licensing requirements." 1990 U.S.C.C.A.N. at 6949 n.36.

Moreover, even if a misdemeanor violation of Florida law could act as a bar to copyright infringement claims, an argument the Court rejects, there has been no adjudication that Oravec has violated any such law. It is not the place for Defendants to assert the State of Florida's rights to punish violations of state law, nor for this Court to adjudicate hypothetical misdemeanors. As such the Court denies Defendants' motion for summary judgment on this ground and grants Oravec's cross-motion for summary judgment.

## VIII. CONCLUSION

The undisputed facts of this case establish that Defendants could not have copied

---

**20.** Fla. Stat. § 481.223 provides that a "person may not knowingly: (a) [p]ractice architecture unless that person is an architect or a registered architect; ... (c) [use] the name or title 'architect' or 'registered architect,' ... or words to that effect, when the person is not then the holder of a valid license issued pursuant to this part." Violation of § 481.223 constitutes a misdemeanor of the first degree.

from Oravec's 2002 or April 2004 copyrighted materials and, in any event, the 2002 copyright protection was abandoned. Oravec's March 2004 copyright materials protect those designs as PSG work, not as architectural works. Thus, the Trump Buildings do not infringe those materials. Finally, the 1996 and 1997 copyrights bear no substantial similarity to the Trump Buildings, a showing required to create an inference that they were copied. Because there is no direct infringement, there can be no contributory or vicarious infringement as a matter of law. Accordingly, it is hereby

ORDERED that

(1) Plaintiff's Motion for Summary Judgment [DE–170] is GRANTED IN PART with respect to the validity of the 1996 and 1997 copyrights and the affirmative defenses of laches and illegal practice of architecture, but DENIED as to the validity of the March 2004 copyright.

(2) Defendants' Motions for Summary Judgment [DE–164, 167] are GRANTED as to the creation dates of the 2002 and April 2004 copyrights, the abandonment of the 2002 copyright, the lack of a viable PGS claim, and the lack of substantial similarity between the Trump Buildings and the 1996 and 1997 copyrights. The Court will enter by separate Order a Final Judgment for all Defendants;

(3) Defendants Motions to Strike [DE–228, 229 and 231] are DENIED;

(4) Plaintiff's Motion for Leave to File Third Amended Complaint [DE–256] is DENIED;

(5) The Court reserves judgment on Plaintiff's Motion for Sanctions [DE–179];

(6) All other pending motions not addressed herein are DENIED AS MOOT; and

(7) This case is administratively CLOSED.

ISOMETRIC VIEW

EX.A1.

SIDEVIEW

ENDVIEW

±00'

PLAN VIEW

ORV-005740

EX.A2

ORV-005743
IX.51

ORV-005749

EX. B2

ORV-003753

EX.83

EX.C1

EX. C2

EX. C3

Rec ß 96

The Sieger Suarez Architectural Partnership

Level 21-26

1/8"

A2-10

level 21-26

1188

EX. D2